2023 IL App (3d) 200389

Opinion filed June 2, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | Appeal No. 3-20-0389 |
| v. | ) ) | Circuit No. 19-CF-0245 |
| MARCUS P. MONTGOMERY, | ) ) | The Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.[1]
Justice Brennan concurred in the judgment and opinion.
Justice Hettel concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     Defendant was charged with aggravated battery (720 ILCS 5/12-3.05(d)(1) (West 2018)). The trial court appointed counsel to represent defendant. On the day defendant's trial was scheduled to begin, defendant requested a continuance to hire private counsel. The trial court denied defendant's request. Defendant then entered a plea of guilty, and the trial court sentenced defendant to nine years and four months in prison. On appeal, defendant argues that the trial court

[1] This case was originally assigned to an entirely different panel, and oral arguments were heard on November 2, 2021. On December 23, 2022, the case was reassigned to the current panel, which has listened to the oral arguments.

(1) erred in denying his request for a continuance, (2) denied him a fundamentally fair sentencing hearing, and (3) abused its discretion in sentencing him. We affirm in part, reverse in part, and remand for a new sentencing hearing before a different judge.

¶ 2                                I. BACKGROUND

¶ 3        On May 1, 2019, defendant was charged with aggravated battery against Delmer Lightbody, knowing he was over 60 years old. At his bond hearing on the same day, defendant asked the court to appoint an attorney for him, stating, "I don't have any income." The court appointed an assistant public defender to represent defendant. On May 23, 2019, defendant was arraigned. At his arraignment, defendant again denied having a source of income and also denied having money to pay a private attorney. The trial court entered an order setting defendant's jury trial for July 29, 2019. Defendant and his appointed counsel appeared in court for a pretrial hearing on July 18, 2019.

¶ 4        On July 29, 2019, while potential jurors were waiting in the courthouse, defendant appeared before the court with his appointed counsel, and stated: "I spoke to my fiancée last night and she's -- she told me a lawyer by the name of David Will said he'd represent me for my case." Defendant explained that Will previously represented him in a criminal case in 2015 in Chicago. The following exchange between the court and defendant then took place:

> "THE COURT: Now, you said your fiancée talked with you last night. Why would you wait until the very last moment for that?
>
> THE DEFENDANT: For to get the lawyer to --
>
> THE COURT:  Mm-hmm.

2

THE DEFENDANT: She's actually talking to him. And she asked did I feel comfortable with the situation, because when I spoke with Mr. Atkins last night, I was aware that it was pretty much trial or plea. And I told her I --

THE COURT: It is.

THE DEFENDANT: Right. So I'm like, I didn't feel -- I'm like, 'How about David? Can you call David and see what David says and would he be willing to take the case?' That's why it got to the last minute thing, because I didn't --

THE COURT: Have you spoken to him?

THE DEFENDANT: No, I haven't."

¶ 5    Defendant's fiancée was not present in court. According to defendant, she was at Walgreens, where she works as a manager. Defendant stated he was employed as a line cook at The Cheesecake Factory in Oak Brook. When the court asked defendant how he would pay for Attorney Will, he said: "[M]y fiancée is actually putting up some of the money now. And I mean, I will be able to help if I get home and get back to my employment." The trial court denied defendant's request, finding it was "made for the purposes of delay."

¶ 6    Before jury selection began, defendant said he wanted to plead guilty. The State explained the facts associated with the incident as follows. The victim, Delmer Lightbody, is 70 years old and suffers from dementia. On April 30, 2019, Lightbody was in a convenience store, East Side Food Market, talking to the clerk when defendant entered and walked to the back of the store to use the automated teller machine (ATM). Lightbody moved around the store chatting with the clerk and moved somewhat near the defendant while he was using the ATM before walking to the front of the store. When defendant finished using the ATM, he walked up to Lightbody at the front of the store and began rifling through his pockets. Lightbody tried to push defendant away, but

3

defendant pursued him through the store. Lightbody ran into a shelving unit and lost his balance. Defendant then grabbed Lightbody and began to punch him. Lightbody fell and began kicking at defendant. Defendant left the store but then returned. Upon his return, defendant picked up pieces of fruit and bags of chips from the floor and threw them at Lightbody. Lightbody then ran behind the cash register. Defendant threw another piece of fruit at Lightbody before leaving.

¶ 7        The entire incident was recorded on a surveillance camera inside the store. At the scene, Lightbody refused medical treatment. Defendant told the court he was "under the influence" at the time of the incident.

¶ 8        The Pre-Sentence Investigation (PSI) report showed that defendant was 34 years old and had a criminal case pending against him in Cook County for two felony counts of possession of a stolen vehicle and one count each of theft, driving while license revoked, and possession of a controlled substance. Defendant was released on bond for those charges on March 26, 2019. In 2016, defendant was convicted of possession of a stolen vehicle and criminal trespass to a vehicle and served 27 months in prison. Defendant was released from prison in 2018 and was on parole at the time of this incident. Defendant's criminal history also included convictions for criminal damage to property and possession of a stolen vehicle in 2015, three convictions for criminal trespass to a vehicle in 2014, a conviction for theft in 2010, and a conviction for possession of cannabis in 2006.

¶ 9        Defendant reported being raised by his mother until the age of 10, when he was placed in foster care because his mother was addicted to heroin. Defendant moved around between foster homes and group homes until he was adopted around the age of 14. His father was largely absent from his life. In 2008, defendant began abusing prescription medication. Defendant began using

4

PCP in 2011, and cocaine in 2015. Defendant reportedly began regularly using alcohol in 2010 or 2011 but denied having an alcohol problem.

¶ 10 At the sentencing hearing, defendant presented the court with a lengthy letter of apology. The court watched the surveillance video from the convenience store and body camera footage from the arresting officer, Jacob Willis of the Peoria Police Department. The court also heard testimony from Willis, who testified that defendant was belligerent and threatened to break an officer's nose and take officers' guns "multiple times" during his arrest. Willis did not question defendant about the incident "[d]ue to his intoxication level." Willis testified that Lightbody was "visibly shaken up" after the incident. Willis observed that Lightbody's "glasses were knocked off" but did not recall seeing any cuts, abrasions, or bruises on Lightbody.

¶ 11 The State requested that the court sentence defendant to the maximum term of ten years in prison in light of defendant's "history of criminality" and "multiple felony convictions." Defense counsel asked the court to impose a sentence of "intensive probation." Defense counsel presented no formal evidence in mitigation and agreed that defendant was convicted of "a number of prior crimes" but argued that "there's no violence in his criminal history." According to defense counsel, "That video showed an individual who was incredibly erratic in his behavior." The trial court disagreed, stating: "He didn't seem to be too erratic. He seemed to be very consistent, consistently bad." The following exchange then took place between defense counsel and the court:

"MR. ATKINS: Your Honor, this is an individual who we see him attack another person in a store, and he comes back.

THE COURT: Right.

MR. ATKINS: That is not -- I don't know how you could describe that --

THE COURT: Not nice.

MR. ATKINS: -- as anything other than erratic behavior.

THE COURT: If he came back and lit a cigarette and sang a gospel song, that would be erratic from the first round, but it seems like he came back and did the same thing. How is that erratic?

MR. ATKINS: Your Honor --

THE COURT: It's bad behavior.

MR. ATKINS: -- in my opinion an individual who commits a crime, runs away, returns almost immediately --

THE COURT: And commits the crime over again.

MR. ATKINS: -- and leaves again and comes back yet again for some further conversation --

THE COURT: He is consistent.

MR. ATKINS: -- that is I think the definition of erratic behavior.

THE COURT: Okay. We have different definitions, but go ahead.

MR. ATKINS: The Defendant reports that he does have a problem with drugs and additionally reports some problem with alcohol usage on that particular day. I believe, Your Honor, that the video that we witnessed is consistent with an individual who is either drunk or high. Certainly --

THE COURT: Well, you will admit that he was incredibly articulate. He wasn't slurring his words. You'll admit that, right?

MR. ATKINS: Absolutely, Your Honor. I did not detect any slurring when he was speaking.

THE COURT: I didn't have to -- I don't think I had to say to my head -- in my head one time, What was the word he just used? I think every word was crystal clear.

MR. ATKINS: Your Honor, I believe that it was actually the influence of drugs more so than alcohol, although I have no reason to doubt that the -- Mr. Montgomery was also using alcohol that day.

THE COURT: Okay.

MR. ATKINS: But I believe that the particular combination of things that he had ingested led to some very bad choices about what he did that particular day, choices that are not at all consistent with the rest of his life.

He is an individual who perhaps would take someone's money, but we have nothing to show that he is an individual who would simply attack a random stranger."

¶ 12    After instructing defendant that he could make a statement, the trial court stated: "You have got to admit that was one incredible video." Defendant then indicated that he wanted to make a statement and began by stating: "First and foremost, I do want to say I wish Mr. Lightbody was here so I could apologize to him in person." The trial court interjected: "If I was him, I wouldn't show my face in front of you." Defendant then went on to apologize, and the following exchange between defendant and the trial court took place:

"THE DEFENDANT: *** I've worked my whole adult life. So I'm not a monster. I'm not a bad person. Yes, I did make a careless, dumb decision. Yes, that was stupid on my part, and I truly do apologize.

THE COURT: I'm kind of surprised that the clerk didn't shoot you.

THE DEFENDANT: I didn't --

THE COURT: A forcible felony inside of his store, I would have killed you. I would not have waited for the police. I'm stunned they didn't do it. I'm stunned that they didn't tase you when you didn't comply and dared them over and over. I stopped counting at 12. You dared them to tase me, tase me, and your focus was on police brutality and the password to my phone.

So help me with that, if you can. If you can't, just you can't, but wow.

***

THE DEFENDANT: And I, I -- I screwed up -- in the store, I didn't -- I mean it is his word against me. I'm wrong. I'm wrong, but I can actually say I did not threaten to kill no one. I don't own a firearm. I've never played with guns. Nothing like that. So I didn't have no gun. I didn't threaten to shoot the guy.

THE COURT: You approached him and you were rifling through his pockets.

THE DEFENDANT: When I was early -- if the other video would have been displayed, I was at the ATM. When I first went in the store, I was going over there to buy cigarettes and withdraw money from the ATM, and that's when Mr. Lightbody came back there and stood over me watching me put my password in the ATM.

THE COURT: Oh.

THE DEFENDANT: And that's what I got hot and bothered for. I'm wrong. I agree. Like I said in my letter, I overreacted. Yes, it was -- it was stupid of me because I should have -- I should have paid attention to the situation, and actually I didn't -- but me at the time -- I'm the first -- I'm not knowing he's dyslexic -- what did she say? He was a little off or whatever. I'm not knowing that.

8

I know he's an older guy, but I didn't -- I thought what he was trying to do was steal from me when he brushed up against my pocket, and that's when I thought he was originally stealing from me, and that's where my behavior and what -- along with a racial slur he said. If there was audio on the video, they would have heard that.

THE COURT: The plot thickens.

Anything else?

THE DEFENDANT: Well, I mean, yes, Your Honor, I'm remorseful. I take full responsibility for what I did. I'm sorry once again. Thank you, Your Honor, for your time.

THE COURT: Thank you.

I've considered the pre-sentence investigation report and the evidence and arguments of the lawyers and the statement of allocution of the Defendant, and I've read his lengthy letter and tried to give due consideration to those things relevant, and I've given consideration to the statutory matters in aggravation and mitigation and the history and character of the Defendant, and I've tried to give due regard to the circumstances and nature of the offense.

I would say to any reviewing court, if that's necessary, watch the video from this sentencing. Watch the video. Watch the video. Watch the video.

Body cameras are two-way streets. Police for the most part don't like them, and it sounds so terribly selfish when you say that, but the truth is that most people wouldn't like a camera following them around recording every word and everything they say at work, but, boy, it sure showed you that day, Mr. Montgomery. My goodness.

9

How many times do you suppose you screamed police brutality and they barely even touched you? They were following your orders, to tell you the truth. Give me my phone. Give me my phone. Give me my phone. Give me my phone. Give me my phone. Give me my f*** phone. Give me my f*** phone. Give me my f*** phone. Give her my f*** phone. Give her my f*** phone. Give her my f*** phone. It's all about your f*** phone. Give her my password. Give her my password. Give her my password.

If you have one family member that watched that and then came to your defense, they should be ashamed of themselves. That was shameful.

If I have one criticism, it would be of what appears to be a kind police officer. But you were running the show, as was your girlfriend or wife or whatever you call her. Do what I say. I don't want to put my feet in the car. My leg hurts. Give her my password. My phone. There's her phone. Now give her my phone. I said give her my phone. Call my lawyer. What's the area code? 708? It's not in my contacts. You're in a whole world having a conversation. You couldn't care less about what you had just done. What a despicable thing you did.

You're not old, Mr. Montgomery, but unless somebody puts you in an early grave, you're going to get old. You didn't have a stable life. I sentenced somebody minutes before you got in here whose mother died when he was six and his grandmother sat right back there in the next to the last row. That was his whole family. His father lives in Florida.

I said, When did you last talk with your father? He said yesterday. But he's never really lived with him. His mother died when he's six. His dad moved to Florida. His grandmother is in Pekin. I never give people time to wind up their affairs after a

sentencing because I think they won't come back or they get cold feet, but in in his case I did. I told him he's got to report on December 3rd or something.

He's a mad, angry young man. He hates the world, kind of like you. He was telling me why his school records said he said the F bomb more than he said any other word. He threatened people all the time. I don't know why he's angry and mad, but maybe you feel that way.

Mr. Montgomery, that was one pitiful display of behavior. If you were at a bar and that happened, I would roll my eyes and think, oh, when is this liquid courage marathon going to get over with. People sign up for that. You know, if you work in a bar, you're going to deal with people who are drunk and disorderly and armed and dangerous.

This is a little neighborhood shop run by people who aren't like you or me, really, to tell you the truth, from a different culture, a different language. They let some little old man who probably is a pain in the ass to some people because he's got dementia and he probably asks the same questions all over again or maybe he's demanding or he's like a little child and every time the clerk says, you know, you got to pay for that, and he says why, and then he says why and he says why and he says why and he says why.

But everybody has got a place on the planet, Mr. Montgomery. I'm guessing Mr. Lightbody lives somewhere near there, and I'm guessing your girlfriend does, I guess. I don't know. But he should be allowed to at 70 -- there was a time I thought 70 was just about graveyard time, but I don't think that anymore.

11

But Mr. Lightbody is apparently not with the program too well, but before you got into the picture, he was wandering around in this little -- the little white storefront here. This was his little world that day, and then you came in to use the ATM.

Maybe he said something. Maybe he didn't. But I got news for you. So what department, who cares division. That could have been my dad. It could have been your dad. I realize that your dad cashed out of your life early on, and I feel badly about you for that, but that's not Mr. Lightbody's fault.

There's a bodega on every third street corner in Chicago, a bodega on Drake Avenue in Chicago. I was in one once, and all I wanted was to buy a banana because I needed change. I set my cell phone on the thing and gave him a dollar and -- gave him a five to buy a banana so I could get some change. I walked out and within 30 seconds I remembered that I forgot my phone. I went back in and, of course, there was no phone. 30 seconds and I walked out. But Mr. Lightbody is not a phone.

I will say you did the right thing by apologizing. I don't know if I believe you because that's pretty damming [*sic*]. Boy, oh, boy, oh, boy.

I say it all the time, I'm stunned at the number of people that don't get shot. I have people, I have some next week, they abduct people and take them into their own house and tie them up and steal their stuff and hold a gun over them.

I am not a gun person. I hate violence, but if somebody comes into my home forcibly or comes to a place where I'm at and should be safe and forces themselves on me and a gun is nearby, they will be leaving not in an ambulance but in a hearse. My, my.

12

Boy, for any reviewing court, I urge them or the clerk or the justice, watch the video, watch the video, watch the video. Wow."

¶ 13 The trial court sentenced defendant to nine years and four months in prison, stating: "I'd like to give you 14 years but the top is ten, but I'm going to take eight months off because you pleaded guilty at the last second, I might add." The court also sentenced defendant to one year of mandatory supervised release (MSR). In sentencing defendant, the court stated:

"If you are in the Department of Corrections, for which you will be, and you wonder why you're there and you blame it on somebody else and you yap off to somebody about how you were mistreated or didn't -- they didn't have the whole story, I'd like to be the person right behind you to look over your shoulder at the person you're talking to and say watch the video."

¶ 14 Defendant filed a motion to reconsider sentence. At the hearing on the motion, defense counsel stated that there was a "strong chance" defendant would be going to drug court for the charges pending against him in Cook County. The prosecutor, Deborah Shelby, responded:

"I suspect this judge has no idea what the Defendant did to commit this offense, hasn't seen what he did to an elderly man, hasn't seen the way he behaved with the police, and that's why he would remotely consider putting him in the drug court program, because from my perspective in this case the Defendant is a violent man, and for that reason, Judge, we believe your sentence was absolutely appropriate and we would ask you to deny the motion to reconsider."

The court then stated as follows:

"All right. Thank you. The motion is respectfully denied. I don't know Judge Cataldo, but if Ms. Shelby is accurate, and I think she probably is, that he doesn't know

13

what happened down here in any measurable degree, it's because nobody showed it to him, but there's still time. Because in my opinion, no fact finder or sentencing judge in their element would have a defendant on drug court or considered for drug court and then while that consideration is pending see the video that happened here and give him drug court.

If that were to occur, I would -- the phrase that comes to mind would involve brains and marbles, and that would be a shame. Did Mr. Montgomery have an alcohol issue? Maybe. Did he have a drug issue? Maybe. How is that Mr. Lightbody's problem? How is that a customer's problem?

And then if that isn't enough, he came back for round two, and then took some -- and took some -- shoplifted some stuff and took it out, and then that behavior on the screen. Ay yi yi. That motion is denied."

¶ 15   In January 2020, this court entered an order remanding the cause to the trial court for further post-plea proceedings, including the filing of a new post-plea motion, the filing of a Rule 604(d) certificate and a *de novo* hearing on the post-plea motion. *People v. Montgomery*, No. 3-19-0713, (Jan. 23, 2020). Thereafter, defendant filed an amended motion to withdraw his guilty plea or reconsider his sentence. The trial court denied defendant's motion. This appeal followed.

¶ 16                                                II. ANALYSIS

¶ 17                                                A. Continuance

¶ 18   Defendant argues that the trial court abused its discretion by denying his request for a continuance to retain private counsel on the day his trial was scheduled to begin.

¶ 19   The right to counsel guaranteed by the federal constitution (U.S. Const., Amends. VI, XIV), the Illinois constitution (Ill. Const. 1970, Art. 1, §8) and the Code of Criminal Procedure

14

(725 ILCS 5/113-3(b) (West 2018)) "includes the right to be represented by counsel of one's own choice." *People v. Green,* 42 Ill. 2d 555, 557 (1969). However, that right "is not absolute." *People v. Johnson,* 109 Ill. App. 3d 511, 517 (1982). A court may deny a defendant's request for a particular attorney if it is "a subterfuge or a dilatory tactic, or otherwise interferes with the orderly administration of justice." *Id*. at 517-18. The right to counsel "may not be employed as a weapon to indefinitely thwart the administration of justice or to otherwise embarrass the effective prosecution of crime." *People v. Friedman,* 79 Ill. 2d 341, 349 (1980) (citing *People v. Solomon*, 24 Ill. 2d 586, 590 (1962)).

¶ 20        The decision to grant or deny a continuance to allow a defendant to retain private counsel is left to the discretion of the trial court and will not be overturned absent an abuse of discretion. *People v. Segoviano*, 189 Ill. 2d 228, 245 (2000). Factors to consider in evaluating a trial court's exercise of that discretion include (1) defendant's diligence, (2) defendant's right to a speedy, fair and impartial trial, and (3) the interests of justice. *Id*.; *People v. Adams*, 2016 IL App (1st) 141135, ¶ 15.

¶ 21        It is an abuse of discretion for a trial court to deny a continuance and to proceed to trial without defendant's chosen counsel when the defendant has retained private counsel or counsel's appearance is on file. *People v. Jackson*, 216 Ill. App. 3d 1, 7 (1991); *People v. Lewis*, 165 Ill. App. 3d 97, 103 (1988). A trial court also abuses its discretion if it denies a defendant a continuance to hire private counsel without adequately inquiring into the defendant's reasons for desiring new counsel. See *Adams*, 2016 IL App (1st) 141135, ¶ 15; *People v. Bingham,* 364 Ill. App. 3d 642, 645 (2006).

¶ 22        However, when "a motion for continuance is based on a defendant's desire to retain private counsel, denial of the continuance will be a proper exercise of judicial discretion if new counsel is

15

not identified or does not stand ready, willing, and able to make an unconditional entry into the case." *Jackson*, 216 Ill. App. 3d at 7. "Where defendant fails to articulate an acceptable reason for desiring new counsel and is already being represented by an experienced, court-appointed criminal lawyer, it is not an abuse of discretion to deny defendant's trial day request for continuance." *Id*.

¶ 23 Here, defendant was charged with aggravated battery on May 1, 2019. On that date, defendant stated he had no income and requested that an attorney be appointed to represent him. At his arraignment on May 23, 2019, defendant again stated he had no income and further stated he had no money to hire a private attorney. When defendant appeared in court with his appointed counsel for his pretrial hearing on July 18, 2019, he made no mention of wanting to hire a private attorney. It was not until July 29, 2019, almost three months after defendant's arrest and the day defendant's trial was set to begin, that defendant first expressed his desire to retain private counsel.

¶ 24 Defendant identified David Will as the attorney he wanted to hire and stated that Will had represented him four years earlier in a case in Chicago. Defendant admitted he had not talked to Will about representing him but said his fiancée had. Neither Attorney Will nor defendant's fiancée was present in court. When the trial court asked defendant why he waited "until the very last moment" to try to retain private counsel, defendant explained that his appointed counsel told him the night before that his only options were to plead guilty or go to trial. The trial court agreed those were defendant's only options.

¶ 25 In this case, the trial court did not abuse its discretion in denying defendant's request for a continuance to hire an attorney on the day trial was scheduled to begin. Although defendant identified Will as counsel he wanted to retain, Will had not filed an appearance and was not present in court expressing his desire to enter an appearance on defendant's behalf. Furthermore, defendant presented no evidence that he had retained Will as his attorney. While defendant stated that his

16

fiancée was "putting up some of the money" to hire Will, defendant presented no evidence that any payment had been made, and defendant's fiancée was not in court to verify that she had paid Will. Because defendant failed to establish that Will had been retained or was "ready, willing, and able" to represent defendant on July 29, 2019, the trial court did not abuse its discretion in denying defendant's request for a continuance. See *Jackson*, 216 Ill. App. 3d at 7.

¶ 26                           B. Defendant's Sentence[2]

¶ 27        Defendant argues that his sentencing hearing was fundamentally unfair because the trial judge was biased and prejudiced against him as evidenced by the court's hostile comments toward him. He further contends that his sentence was excessive because the trial court considered only his conduct as shown in the surveillance and body camera videos and failed to consider mitigating factors, such as his non-violent criminal history and his drug and alcohol problems.

¶ 28        A sentencing hearing is fundamentally unfair when the proceeding is affected by judicial bias. *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 47. Trial judges are presumed to be impartial, and the party claiming bias bears the burden of overcoming this presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. To demonstrate bias or prejudice by the trial court, the defendant must present evidence of "something more" than an unfavorable result. *Rademacher*, 2016 IL App (3d) 130881, ¶ 47 (quoting *People v. Vance,* 76 Ill. 2d 171, 181 (1979)). That "something more" is "a showing of animosity, hostility, ill will or distrust towards this defendant." *Vance*, 76 Ill. 2d at 181*; People v. Nelson*, 206 Ill. App. 3d 956, 967 (1991). We review *de novo* whether a trial court has demonstrated bias against a defendant resulting in a fundamentally unfair

---

[2] Though we observe that defendant has completed his term of imprisonment, the question regarding his sentence on remand is not moot. Defendant must complete a term of Mandatory Supervised Release (MSR) and, while we express no opinion in this regard, we note that a reduction of his prison sentence might affect how long he could be reincarcerated for any violation of his MSR. *People v. Jackson*, 199 Ill. 2d 286, 294 (2002) (citing 730 ILCS 5/3-3-9(a)(3)(i)(B) (West 2018)).

17

sentencing hearing. See *Romero*, 2018 IL App (1st) 143132, ¶ 96. Here, the trial court's remarks at the sentencing hearing amounted to sufficient evidence of judicial bias.

¶ 29    Initially, as defendant made his statement in allocution, the trial court interrupted, expressing his surprise that the convenience store clerk "didn't shoot you" and declaring, "I would have killed you. I would not have waited for the police." The court proceeded to mimic defendant's expletive-laden rant recorded on the arresting officer's body camera footage, in which a handcuffed defendant can be heard repeatedly insisting that the officer give his cell phone to defendant's wife. The trial court summarized, "It's all about your f*** phone." The trial court told defendant, "If you have one family member that watched that and then came to your defense, they should be ashamed of themselves," and, "If you were at a bar and that happened, I would roll my eyes and think, oh, when is this liquid courage marathon going to get over with."

¶ 30    After noting that the victim was a "little old man" with dementia who frequented the convenience store, the trial court stated, "That could have been my dad." The trial court inexplicably proceeded to recount an incident where his own cell phone was apparently stolen in a "bodega" in Chicago. The trial court then expressed his astonishment at "the number of people that *don't* get shot." (Emphasis added.) The trial court declared that, while he was "not a gun person" and hated violence, "if somebody comes into my home forcibly or comes to a place where I'm at and should be safe and forces themselves on me and a gun is nearby, they will be leaving not in an ambulance but in a hearse."

¶ 31    With that, the trial court sentenced defendant to nine years and four months, noting that he would have liked to give defendant 14 years "but the top is ten." The trial court concluded by cautioning that if defendant "yap[s] off to somebody" while in prison about how he was mistreated, "I'd like to be the person right behind you to look over your shoulder at the person you're talking

18

to and say watch the video." We have previously held that a sentencing court's harsh criticism of defendant's crime is not evidence of judicial bias. *Rademacher*, 2016 IL App (3d) 130881, ¶ 48. Here, however, the trial court's remarks exceeded mere censure of criminal conduct. In fact, much of the court's remarks concerned defendant's behavior upon arrest, rather than the charged offense itself. At one point, the court went so far as to criticize the "kind" arresting officer, who allowed defendant to "run the show" by tolerating his repeated demands. The court's animus toward defendant manifested immediately thereafter—by its language—when it disdainfully referred to defendant's wife as "your girlfriend or wife or whatever you call her." Later in the hearing, the court's animus toward defendant turned into distrust. The court stated that although defendant did the right thing by apologizing, "I don't know if I believe you because that's pretty damming [*sic*]. Boy, oh, boy, oh, boy."

¶ 32    While we neither condone defendant's conduct nor minimize the circumstances of the crime, the inescapable conclusion from a review of the record is that the sentencing hearing was affected by judicial bias. "Judges are required to be fair and dispassionate arbitrators above all else." *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997). The Illinois Code of Judicial Conduct requires judges to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity." Ill. S. Ct. R. 63(A)(3) (eff. Dec. 16, 2020). Not only did the trial court fail to meet this standard, it also failed to hide its animosity toward defendant. The court's animosity was laid bare in the sentencing hearing when it (1) mimicked defendant's demands to the arresting officer, (2) referred dismissively to defendant's wife, (3) envisaged a hypothetical prison scenario where it would personally discredit defendant's claims of mistreatment, (4) criticized the arresting officer's patience in dealing with defendant, (5) suggested the officer should have tased defendant upon noncompliance, and (6) most

19

disconcerting of all, stated it would have killed defendant if it were in the store clerk's shoes. If remarks of this nature do not traverse the bounds of due process and amount to the "something more" necessary to demonstrate judicial bias, the standard is meaningless. Accordingly, we find that the court's alarming remarks at the sentencing hearing rendered the hearing fundamentally unfair.

¶ 33    We therefore vacate defendant's sentence and remand the cause for a new sentencing hearing before a different judge. The issue of whether the court abused its discretion in sentencing defendant is moot.

¶ 34                                  III. CONCLUSION

¶ 35    The judgment of the circuit court of Peoria County is affirmed in part and reversed in part. The case is remanded for a new sentencing hearing before a different judge.

¶ 36    Affirmed in part and reversed in part.

¶ 37    Cause remanded.

¶ 38    JUSTICE HETTEL, concurring in part and dissenting in part:

¶ 39    I concur with the majority's conclusion that the trial court did not abuse its discretion in denying defendant's request for a continuance but respectfully dissent from the majority's finding that defendant's sentencing hearing was fundamentally unfair.

¶ 40    A trial court's derogatory statements directed toward the defendant can demonstrate bias or prejudice. See *People v. Jones*, 2016 IL App (1st) 141008, ¶¶ 37-38; *Phuong*, 287 Ill. App. 3d at 994. However, "the mere expression by a judge of an opinion, or the fact that a judge has strong feelings on an issue, does not amount to bias or prejudice." *People v. Nelson*, 206 Ill. App. 3d 956, 967 (1991) (citing *People v. Hooper*, 133 Ill. 2d 469, 513 (1989)); see also *Rademacher*, 2016 IL App (3d) 130881, ¶ 48 (court's "harsh criticism, based on the particular facts of a defendant's case,

20

does not constitute any sort of evidence of prejudice derived from personal bias"). "*Not* establishing bias or partiality *** are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even *** judges, sometimes display." (Emphasis in original.) *Liteky v. United States*, 510 U.S. 540, 555-556 (1994). A trial court's remarks that are uncomplimentary to the defendant do not necessarily demonstrate prejudice or bias. See *People v. Moore*, 2023 IL App (1st) 211421, ¶ 128.

¶ 41    Here, the trial court expressed outrage at defendant's seemingly unprovoked violent attack of a 70-year-old man with dementia in a convenience store. In doing so, the court understandably expressed dissatisfaction and even anger at defendant's conduct. While the court condemned defendant and his conduct in strong terms, the court's statements did not demonstrate evidence of a personal bias against defendant, his counsel or an entire class of criminal defendants. See *Rademacher*, 2016 IL App (3d) 130881, ¶ 48; *Jones*, 2016 IL App (1st) 141008, ¶ 37; *Phuong*, 287 Ill. App. 3d at 994.

¶ 42    In reaching this conclusion, I do not condone the trial court's behavior or comments during the sentencing hearing. The trial court did not demonstrate patience, dignity or courtesy to defendant or his attorney, as required by the Judicial Code of Conduct, by repeatedly interrupting defense counsel during his argument and defendant during his allocution. Additionally, the judge's mimicking of defendant, his use of hyperbole, and his comment that he "would have killed defendant" were "inappropriate in both style and content." See *United States v. Lopez*, 974 F. 2d 50, 52-53 (7th Cir. 1992). The courtroom is not a stage. "The public's expectation that justice will, in fact be rendered; that every judgement is grounded on the proper application of existing laws to the facts as presented, is vital to engendering confidence in our court system and institutional respect for our judiciary." Supreme Court of Illinois, Statement of Expectations for Illinois Judges

21

(eff. Dec. 1, 2008). Nevertheless, I find that the trial court's comments and conduct toward the defendant did not deny him a fundamentally fair sentencing hearing. Thus, I would affirm defendant's sentence.