# Illinois Official Reports

## Appellate Court

*People v. Lopez*, 2019 IL App (3d) 170798

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMIE L. LOPEZ, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-17-0798 |
| Filed | January 4, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 94-CF-782; the Hon. Richard A. Zimmer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Jeffrey J. Neppl and Theresa L. Sosalla, of Neppl & Zhang Law Firm LLC, of Rock Island, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, David J. Robinson, and Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justices Holdridge and Wright concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant, Jamie L. Lopez, appeals the third-stage denial of his successive postconviction petition, arguing that the court erred in denying his postconviction petition where the sentencing court failed to consider defendant's youth when determining his sentence. We affirm.

¶ 2                         I. BACKGROUND

¶ 3      In 1995, defendant was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 1994)) and aggravated battery (*id.* § 12-4(b)(1)). The evidence at trial established that Chad Van Klavern and Craig Jordan were attacked with a club. Our brief review of the facts is based on our order in *People v. Lopez*, No. 3-95-0421 (1996) (unpublished order under Illinois Supreme Court Rule 23). Van Klavern died due to multiple craniocerebral injuries; a police officer testified that he was able to observe Van Klavern's brain through a golf ball sized hole in his skull. Jordan survived but suffered a head wound requiring 11 staples. The Moline Police Department questioned Augustin Torres about the incident based on an anonymous tip. During questioning, Torres implicated himself, defendant, and Anthony Olvera. The police conducted an investigation and recovered the club and clothing allegedly worn by defendant during the attack. The blood on the clothing matched Van Klavern's blood. Olvera and Torres testified that it was defendant's idea to attack Van Klavern and Jordan. Torres testified that defendant alone attacked Van Klavern with the club. Defendant told them to deny that he was with them at the time of the incident if they were questioned by police.

¶ 4      A sentencing hearing was held on May 9, 1995. In mitigation, a pastor testified that defendant did some volunteer work. As a result, the pastor developed a positive opinion of defendant. Defendant's mother testified that she and defendant's father got divorced and remarried twice, which had a negative impact on defendant. She stated that defendant's sister was diagnosed with "manic depressive illness" and defendant was worried and concerned about her. Defendant's father testified that he had a good relationship with defendant, revolving particularly around baseball. He said defendant had a strong faith.

¶ 5      The presentence investigation report (PSI) established that defendant was 16 years old at the time of the PSI. He completed the tenth grade but dropped out "because there were too many kids that he was afraid to be around." He had earned three credits of the 21.5 required for graduation, had a grade point average of 0.167, and was ranked 567 out of 576. According to the school, defendant was dropped from school due to lack of attendance.

¶ 6      Defendant told the police that he was not with Torres and Olvera on the day of the incident but that the two of them "had been pressuring him to become involved in activities that he did not wish to become involved in." Defendant also said that the blood found on his clothing could have come from a fight he had earlier, since he got into a lot of fights. He further stated that he had loaned clothes to Torres and Olvera in the past. Defendant's prior juvenile record included disturbing the peace, two separate retail thefts, and a curfew violation. Defendant reported that he had good relationships with his parents but that his relationship with his mother changed when he became a teenager "and began being dragged down by his peers." Defendant's parents reported that two of his sisters were diagnosed as manic depressive. Defendant reported that he did not belong to a gang but was "involved

with" Gangster Disciples, Vice Lords, and the Bishops. Defendant first drank alcohol at age 14 and last drank in September 1994. He said drinking caused problems with his girlfriend, friends, and at home. Defendant reported that he started smoking marijuana at age 15.

¶ 7 The PSI further included information regarding defendant's time at the Mary Davis Detention Home. At first, defendant had a number of "lock up offenses" because he had a difficult time adjusting. However, it was reported that he had improved. A counselor reported that the home had a grading process based on room neatness, behavior, peer interaction, and authority problems. Defendant had been receiving C's and D's. He then improved and started earning B's and then A's. Defendant started volunteering for chore assignments and was a good worker, showed good sportsmanship, and wrote and performed a positive rap for teens in a talent show. Defendant stopped retaliating when taunted by racial slurs. The PSI further included multiple victim impact letters from friends and family of Van Klavern.

¶ 8 Defendant made a brief statement in allocution in which he stated that he was sad about the tragedy and sorry for the families of the victims and his own family. The State asked the court to sentence defendant to between 45 and 55 years, which was less than the maximum, based on defendant's potential for rehabilitation.

¶ 9 The court stated that it had considered the PSI and the evidence presented. The court then stated:

"But factors in aggravation and mitigation—the first, the defendant's criminal conduct neither caused nor threatened serious physical harm to another, and second, the defendant did not contemplate that his criminal conduct would cause or threaten serious physical harm to another. I cannot consider them in lieu of the fact it's an element of the offense in this case, when death is an element of the offense and serious bodily harm, Court cannot consider that at sentencing, a sentence is not aggravated or mitigated in this case.

Number three, the defendant acted under a strong provocation. From what evidence Court has heard throughout this entire trial, the facts, even at Torres' trial, it's clear this was an unprovoked assault by two young teenagers out beyond hours that they should be out on the street, up in Chicago, travelling around unsupervised, they should not be travelling in Chicago, should be home, but in any event on the night in question when this—the night this murder occurred, an aggravated assault occurred, these defendants acted under no provocation. In fact, the statement of [defendant] himself as he told one of his friends the day afterwards when he is getting rid of the club, the lower portion of the club, he said they beat up two guys, jumped two guys because they had nothing else to do. Nothing else to do—so on the night in question—Court finds absolutely no provocation, no taunting by Van Klavern, no taunting by Jordan, they were simply walking home.

There were substantial grounds tending to excuse or justify the defendant's criminal conduct though failing to establish a defense. I don't find any in this case.

The defendant's criminal conduct was induced or facilitated by someone other than the defendant. Yes and no. I think it's clear if you listen to the testimony of Olvera and Torres, corroborated by friends of the defendant he was prime mover in this case to go outside and assault the two boys. Now that doesn't excuse Torres. He knew exactly what he was doing. He got out of that car with the defendant, they took parts of that club, crawled by a cement wall waiting to assault two young men in the

- 3 -

street. I think it's clear he and Torres were two planners of the fight and prime mover was [defendant].

Defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained. Inapplicable in this case. No monetary damage shown here, no monetary damage that would apply.

The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present crime. No great criminal record. I want to note [he] had drug problems, very serious in the [PSI], his mother was attempting to get him help for, had a fighting problem, but his real record was couple thefts as you point out. I am not basing—if anything is probably mitigating to the defendant.

The defendant's criminal conduct was the result of circumstances unlikely to recur. Court cannot come to that conclusion, [defendant], you have tried to alibi for yourself from day one when the evidence is overwhelming against you. You never thought your friends would turn on you but they did, they helped convict you in this case, the people you ran with, not the people the victim ran with, day after the crime depositing of evidence, lower half of the club with blood on it. It's clear the day after, after the day of the crime, you are taking people to the crime scene, almost in a bragging way this is where we jumped two people, had a fight, pointed it out to your friends, had this alibi in Court, you weren't there, all the way—

The imprisonment of the defendant would entail excessive hardship to his dependents. No evidence of that—he has no dependents at this point.

The imprisonment of the defendant would endanger his or her medical condition. No evidence of this and not mentally retarded as defined in the Code, I don't find factors in mitigation there.

Factors in aggravation, actually the flip side. I think when you turn to this, sentence necessary to deter others from committing the same crime.

Court is considering [defendant's] rehabilitation potential which you, you are a young man, you have committed a horrible crime. The Court must balance this, all parties argue before the Court, what is the appropriate sentence, the Court finds clearly you have a rehabilitation potential, it appears to me you improved your life in terms of academics. It appears you have had some athletic talent. On the other hand Court must consider this crime, what you have done, the degree of participation, you were the prime mover, and a degree of participation between you and Torres, you were on the crime scene beating not only Van Klavern but Jordan, testimony clearly supported that, as [the State] pointed out, the only reason this assault stopped is because those neighbors came out, you were there beating, flailing away, the match up of the blood on the lower half of the club, on the coat that you were wearing, clearly presents an implication that corroborates the testimony of Torres and Olvera and Craig Jordan, that you were clearly assaulting Van Klavern much more than Torres, that doesn't excuse anything, however. I do note difference in participation—the fatal assault of Van Klavern—there's also testimony you were beating on Jordan. He says two people assaulted him at one point—it appears from the testimony—his testimony somewhat self-serving—it's clear he was assaulting Jordan at the time although he did go over, assault with the upper portion of the club,

also on Van Klavern, this case is about protection of people walking the streets, and people should be free to walk the street whether it be at night, daytime, they shouldn't have to worry about assault from young teenagers; young teenagers ought not to be contemplating with nothing else to do to decide we are going to assault two people on the street in Rock Island County or any County in the State of Illinois. You are dangerous to the public even though you have rehabilitation potential. You are still very dangerous, [defendant]. I don't think you to this day realize what you have done in this case. But Courts have a duty to protect the citizens and Courts have a duty to punish severely defendants who without provocation assault people on the street, irrespective of their age."

The court sentenced defendant to 50 years' imprisonment on the murder conviction to run concurrent with a sentence of 5 years' imprisonment on the aggravated battery conviction. We affirmed defendant's convictions and sentences on direct appeal. *Lopez*, No. 3-95-0421.

¶ 10    In 1997, defendant filed a petition for postconviction relief, presenting various ineffective assistance of counsel arguments. The circuit court denied the petition after an evidentiary hearing. This court affirmed the denial on appeal. *People v. Lopez*, No. 3-98-0395 (1999) (unpublished order under Illinois Supreme Court Rule 23).

¶ 11    In 2000, defendant filed a motion for leave to file a successive postconviction petition, stating that his initial petition was deficient and alleging unreasonableness of postconviction counsel. The circuit court denied the motion, and this court allowed counsel's motion to withdraw and affirmed the denial of the motion pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Lopez*, No. 3-02-0298 (2004) (unpublished order under Illinois Supreme Court Rule 23).

¶ 12    In 2015, defendant filed a second motion to file a successive postconviction petition, which is the subject of the instant appeal. In his motion, defendant alleged that the sentencing court failed to take sufficient consideration of his youth under *Miller v. Alabama*, 567 U.S. 460 (2012). The circuit court denied the motion, stating that defendant failed to aver facts that would change the verdict or offer new evidence. Defendant filed a motion to reconsider and for leave to file an amended postconviction petition, both of which were granted.

¶ 13    On April 25, 2017, a third-stage evidentiary hearing was held on the amended petition. Dr. Antoinette Kavanaugh testified as a defense expert that she was a forensic clinical psychologist. She had worked with the Office of Juvenile Justice and Delinquency Prevention developing a curriculum to be used in juvenile courts and detention centers. She had recently published an article entitled, "Prospects for Developing Expert Evidence in Juvenile *Montgomery* Resentencing Cases," which discussed "how psychologists can help, can present information to the Court that's individualized and addresses the *Miller* factors instead of what we can and can't do." She stated that she had testified in court "[h]undreds of times." She reviewed the transcript from defendant's sentencing hearing and the PSI. She discussed how juvenile brains operate differently than adult brains. Because of their brains, juveniles act impulsively, are easily influenced by their peers, have trouble planning ahead, are not as good at gauging risk, seek sensation, and are less able to delay gratification. After reading the sentencing transcripts, Kavanaugh made some observations, stating:

   "So one is the idea that sentence he was given that he, the judge, said in the sentencing hearing transcript, sentence that he was imposing a sentence necessary to deter others from committing the same crime.

- 5 -

Empirically, we have a strong body of research to show that a strict sentence does not deter other adolescents from committing the same act, so—so that's wrong from a psychological perspective.

And he also said I don't think you, to this day, realize what you have done in this case.

I think from a developmental perspective it's not unusual for an adolescent not to appreciate the gravity of their act at the time and until they have matured, so that, I don't think, reflects some of the things that the courts have said to be considered in sentencing.

I don't—this is a typo because there should be a quote there, but courts have a duty to protect the citizens and courts have a duty to punish severely the defendant, who, without provocation, assault people on the streets, irrespective of their age and the idea certainly from *Miller* and *Montgomery* is that age and the features of, that a characteristic of that age, in fact, should be something that's considered."

Kavanaugh stated that the PSI noted that defendant's relationship with his parents changed when he became a teenager, he began drinking at 14 years of age, and began using cannabis at 15 years of age. Kavanaugh stated:

"It's my clinical opinion that there's nothing in the transcript of the sentencing hearing that clarifies how the judge considered these things despite the fact that they are in the PSI, which was known at the time or the clinical or how the adolescent brain is structured and functions different than an adult brain. I saw nothing in there in the record that noted that."

¶ 14　　　　Ultimately, the court denied defendant's amended postconviction petition, finding that the *Miller* factors did not apply to defendant's sentence as the sentence did not amount to a *de facto* life sentence or an actual life sentence where he was sentenced to 50 years' imprisonment, with day-for-day credit, and would thus be released when he was approximately 41 years old. The court further found that the sentencing court "did look at [defendant's] youthful status, [it] looked at all the factors, and exercised discretion within the sentencing range."

¶ 15　　　　Defendant filed a motion to reconsider, which was denied. In doing so, the court stated:

"I think the Court made the appropriate ruling when it denied the petition.

I do want to comment on one thing. The defense did argue regarding [the sentencing court's] comment, and specifically that comment in paragraph 6 of the supplemental brief filed by the defense. The record of [defendant's] sentencing hearing, including the PSI reports reviewed by the Court, do contain information applicable to the *Miller* factors. [Defendant's] case is distinguished from *Holman* in at least one significant fact. The Court stated specifically that it was sentencing [defendant] to 50 years irrespective of his age. And I don't read that part of the transcript as saying what the defense argue it says.

[The sentencing court] was giving [its] ruling, and [it] says: [']You are dangerous to the public. Even though you have rehabilitation potential, you are still very dangerous, [defendant]. I don't think you to this day realize what you have done in this case.[']

And then the applicable language, which defense is citing: ['\]But courts have a duty to protect citizens and the courts have a duty to punish severely defendants who without provocation assault people on the street irrespective of their age.[']

I don't read that as saying [the sentencing court] is sentencing [defendant] irrespective of his age. I read that as a general statement, a general principle of law or concept that [the sentencing court] has that courts have a duty to punish defendants severely who without provocation assault people on the street, and that that duty is present regardless of their age.

And I think when you read [the sentencing court's] comments in their entirety and, in fact, as stated in the brief, the record of [defendant's] sentencing hearing, including the PSI reports reviewed by the court do contain information applicable to *Miller* factors."

¶ 16                                   II. ANALYSIS

¶ 17    On appeal, defendant argues that the court erred in denying defendant's postconviction petition because the sentencing court, when sentencing defendant to 50 years' imprisonment, did not consider defendant's "youth and its attendant circumstances." Upon review, we find that defendant's sentence is not a *de facto* life sentence and does not fall within the category of cases considered by *Miller* and its progeny. Moreover, even if defendant's sentence was a *de facto* life sentence, the circuit court adequately considered defendant's youth and its attendant circumstances.

¶ 18    "The Post-Conviction Hearing Act offers a procedural device through which a criminal defendant may assert that 'in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both.' " *People v. Holman*, 2017 IL 120655, ¶ 25 (quoting 725 ILCS 5/122-1(a)(1) (West 2010)). Here, defendant argued that his sentence of 50 years' imprisonment was unconstitutional under the eighth amendment.

¶ 19    "The United States Supreme Court has repeatedly recognized the special characteristics of juvenile offenders." *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 52.

> "When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. In *Roper* [*v. Simmons*, 543 U.S. 511 (2005)], *Graham* [*v. Florida*, 560 U.S. 48 (2010)], and *Miller*, the United States Supreme Court addressed that risk and unmistakably instructed that youth matters in sentencing. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. *Roper*, 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. *Graham*, 560 U.S. at 82. And *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. *Miller*, 567 U.S. at 489, 132 S. Ct. at 2475." *Holman*, 2017 IL 120655, ¶ 33.

Subsequently, our supreme court has held that *Miller* and its progeny stand for the proposition that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." *Id.* ¶ 40. *De facto* life sentences also fall into this category, as

"[a] mandatory term-of-years sentence that cannot be served in one lifetime has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *People v. Reyes*, 2016 IL 119271, ¶ 9.

In sum, if sentencing a juvenile defendant to life imprisonment or an unsurvivable prison term, it must first consider defendant's youth and attendant circumstances. Thus, in analyzing a juvenile defendant's sentence under the *Miller* cases, we first determine whether defendant's sentence amounted to life imprisonment or a *de facto* life sentence. If so, then we determine whether the court considered defendant's youth and its attendant circumstances.

¶ 20 Here, defendant was sentenced to 50 years' imprisonment, with day-for-day sentencing credit. According to the Illinois Department of Corrections inmate database, which we take judicial notice of (*People v. Smith*, 2014 IL App (4th) 121118, ¶ 34), defendant is scheduled to be paroled on May 15, 2019, when he is almost 41 years old. Defendant's sentence does not amount to a *de facto* life sentence and does not fall into the category of cases considered by *Miller* and its progeny. Defendant's sentence is similar to a myriad of cases in which the court held that the sentence imposed did not amount to a *de facto* life sentence. See, *e.g.*, *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 73 (50-year sentence, allowing release at age 65); *Gipson*, 2015 IL App (1st) 122451, ¶¶ 65-67 (52-year sentence, allowing release at age 60); *People v. Pearson*, 2018 IL App (1st) 142819, ¶ 49 (50-year sentence, allowing release at age 55); *People v. Evans*, 2017 IL App (1st) 143562, ¶ 14 (90-year sentences, with day-for-day credit, allowing release at age 62). In fact, when released on parole defendant will be significantly younger than many similarly situated defendants.

¶ 21 In coming to this conclusion, we reject defendant's request to extend the *Miller* line of cases to every case in which juvenile defendants are convicted of "Adult Crimes." As stated above (*supra* ¶ 19), *Miller* and its progeny apply to some sort of life sentence for juveniles, whether mandatory, discretionary, or *de facto*, not to all juveniles convicted as an adult.

¶ 22 Significantly, even if the sentence here was a *de facto* life sentence, the record is clear that the court considered defendant's youth and circumstances when sentencing defendant. Under *Miller* and subsequent case law, a defendant may be sentenced to life imprisonment or a *de facto* life sentence but only after the court has considered "the defendant's youth and its attendant characteristics." *Holman*, 2017 IL 120655, ¶ 46. Such characteristics include, but are not limited to:

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.*

"The inquiry into whether a sentencing court complied with *Miller* is backwards-looking." *Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 76.

"[T]he only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing. *** A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Holman*, 2017 IL 120655, ¶ 47.

¶ 23 Here, the sentencing court stated that it had considered the PSI, the evidence presented by the parties, and the evidence from trial. The PSI stated that defendant was 16 years old, and the court noted more than once that defendant was young. Defendant's parents both testified at the sentencing hearing about defendant's home life, and ample information regarding it was included in the PSI. "Where relevant mitigating evidence is before the court, it is presumed that the court considered it absent some indication in the record to the contrary other than the sentence itself." *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994). The PSI included information about defendant's drug and alcohol use. In the PSI, defendant stated that Torres and Olvera "had been pressuring him to become involved in activities that he did not wish to become involved in." The court noted that defendant was the "prime mover" behind the incident, but noted the peer involvement. The PSI showed that defendant had only completed tenth grade and had a low grade point average, but there was no evidence presented that defendant was incompetent or could not communicate with police officers or prosecutors. Further, the court specifically noted that defendant had rehabilitative potential and the PSI showed his marked improvement while at the Mary Davis Detention Home. Therefore, the court adequately considered the *Miller* factors.

¶ 24 In coming to this conclusion, we note that defendant says, "the court specifically stated that it was sentencing [defendant] to 50 years 'irrespective of [his] age.' " He then provides five definitions of the word "irrespective" and argues that such statement means that the court did not consider defendant's age. At the motion to reconsider the denial of the postconviction petition, the circuit court responded to the same argument, stating:

"[The sentencing court said, ']But courts have a duty to protect citizens and the courts have a duty to punish severely defendants who without provocation assault people on the street irrespective of their age.[']

I don't read that as saying [the sentencing court] is sentencing [defendant] irrespective of his age. I read that as a general statement, a general principle of law or concept that [the sentencing court] has that courts have a duty to punish defendants severely who without provocation assault people on the street, and that that duty is present regardless of their age."

We agree with the circuit court's assessment.

¶ 25 We further reject defendant's statement that "Dr. Kavanaugh's learned conclusion that the transcript of the sentencing hearing failed to support a finding that the sentencing judge thoughtfully considered and applied the 'transient characteristics of youth' must be given great weight in evaluating whether [defendant's] sentence is in compliance with our constitution." Kavanaugh specifically stated:

"It's my clinical opinion that there's nothing in the transcript of the sentencing hearing that clarifies how the judge considered these things despite the fact that they are in the PSI, which was known at the time or the clinical or how the adolescent brain is structured and functions different than an adult brain. I saw nothing in there in the record that noted that."

- 9 -

First, as stated above, when mitigating evidence is presented, it is presumed that the court considered it, unless there is some indication to the contrary. *Supra* ¶ 23 (citing *Dominguez*, 255 Ill. App. 3d at 1004). Here, there was no indication to the contrary. There is no requirement that the court explicitly state on the record everything it considered when sentencing the defendant or the weight it gave. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 227. Second, Kavanaugh's clinical opinion has no bearing on our legal review of the facts of defendant's sentencing hearing. Kavanaugh did not interview defendant when he was 16 years old and did not have any opinion on defendant's specific mental development and characteristics at that time.

¶ 26                          III. CONCLUSION

¶ 27          The judgment of the circuit court of Rock Island County is affirmed.

¶ 28          Affirmed.