2025 IL App (1st) 231224-U

FIFTH DIVISION
August 1, 2025

No. 1-23-1224

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 21078 |
| | ) | |
| STESHAWN BRISCO, | ) | Honorable |
| | ) | Stanley Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Mitchell and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's aggregate 39-year sentence for first degree murder and aggravated battery with a firearm. We reject his claims that the trial court violated section 5-4.5-105(a) of the Unified Code of Corrections and abused its discretion in its consideration of the juvenile sentencing factors enumerated in *Miller v. Alabama*, 567 U.S. 460 (2012). We also reject the claim that the trial court was improperly predisposed to give defendant a harsh sentence.

¶ 2    Following a jury trial, defendant Steshawn Brisco, who was 17 years old at the time of the offenses, was found guilty of first degree murder and aggravated battery with a firearm and sentenced to 75 years in prison. We affirmed on direct appeal. *People v. Brisco*, 2015 IL App (1st) 130545-U.

¶ 3 The supreme court denied Mr. Brisco's petition for leave to appeal (PLA), but also directed us to vacate our initial order and consider the effect of *People v. Buffer*, 2019 IL 122327, "on the issue of whether Mr. Brisco's sentence constituted a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012), and determine if a different result was warranted." *People v. Brisco*, No. 119159 (Ill. Mar. 25, 2020) (supervisory order).

¶ 4 After vacating our 2015 decision, we again affirmed the findings of guilt, but, with one justice dissenting, vacated Mr. Brisco's sentences and remanded for a new sentencing hearing in compliance with *Miller* and section 5-4.5-105(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105(a) (West 2018)). *People v. Brisco*, 2020 IL App (1st) 130545-UB.

¶ 5 On remand, the trial court imposed a total of 39 years in prison. Mr. Brisco now appeals, contending that the trial court violated section 5-4.5-105(a) of the Code and abused its discretion when it failed to accurately consider the *Miller* factors. Mr. Brisco also argues that the trial court was improperly predisposed to impose the harshest possible penalty based upon resentment toward this court for vacating the sentence originally imposed. For the reasons that follow, we reject Mr. Brisco's claims that this sentence violated the statute or was an abuse of the vast amount of discretion allotted to trial judges in imposing sentences. We also reject his claim that the trial court was improperly predisposed to give him a lengthy sentence. Accordingly, we affirm.

¶ 6                                          I. BACKGROUND

¶ 7 The trial evidence is set out fully in our earlier decision. *Brisco*, 2020 IL App (1st) 130545-UB. We briefly summarize it here.

¶ 8 On August 10, 2010, eight-year-old Tanaja Stokes suffered a fatal gunshot wound to the head while playing outside. Ariana Jones, Stokes's seven-year-old cousin, suffered a gunshot wound to the head resulting in a depressed skull fracture and subarachnoid hemorrhage. The police

investigation revealed that the gunshots were directed at a group of young men on a corner. Witnesses identified Mr. Brisco and Marcus Cocroft, who is not a party to this appeal, as the perpetrators. The testimony established that Mr. Brisco and Mr. Cocroft wore black clothing and baseball caps at the time of the shooting and that Mr. Brisco later stated that they did a "hit," and bragged about a shooting on "D Block."

¶ 9    Mr. Brisco was found guilty of first degree murder and aggravated battery with a firearm and sentenced to a total of 75 years in prison. We affirmed on direct appeal (*Brisco*, 2015 IL App (1st) 130545-U) and then, pursuant to the supreme court's supervisory order, vacated his sentences and remanded for a new sentencing hearing (*Brisco*, 2020 IL App (1st) 130545-UB).

¶ 10    On remand, following a hearing, Mr. Brisco was found fit for sentencing. The fitness hearing included evidence that Mr. Brisco was diagnosed with major depressive disorder, panic disorder without agoraphobia, post-traumatic stress disorder (PTSD), cannabis use disorder, and attention-deficit/hyperactivity disorder (ADHD).

¶ 11    The trial court ordered a new presentence investigation (PSI) report. According to the PSI report, Mr. Brisco had one child, was involved in the Black Disciples gang, and previously used alcohol, marijuana, and ecstasy. Mr. Brisco completed a substance abuse program at age 13. Mr. Brisco's criminal background included a juvenile adjudication for burglary and a conviction for unlawful possession of a firearm, for which Mr. Brisco was convicted as an adult. Mr. Brisco told the PSI investigator that "his home environment was 'chaotic' " and included family fights, his mother's drug and alcohol abuse, and his father's absence. Mr. Brisco "did not have a good childhood," experienced physical, emotional, and sexual abuse, and witnessed domestic violence. He ran away from home at least five times and was removed from his family's custody at around 12 years old. Prior to his arrest, Mr. Brisco completed the tenth grade. He was enrolled in special

education classes due to "his Emotional Behavior Disorder (EBD) condition," was an average student, and had been suspended due to fighting. Mr. Brisco was diagnosed with EBD, depression, PTSD, and bipolar disorder, but was currently unmedicated. Mr. Brisco felt that he "generally lacked control over events in his life because of his immaturity, poor decision making, being too emotional, and [having] no patience." While incarcerated, Mr. Brisco obtained over 20 certificates in life skills, cognitive behavior, job skills, and parenting. Mr. Brisco reported to the PSI investigator that he wanted to work as a singer/songwriter. Mr. Brisco also told the investigator that felt he was unable "to meaningfully participate in his original defense" due to his youth and his attorneys' instructions to keep quiet. Mr. Brisco stated that he and Mr. Cocroft were "living in fear" and had $10,000 bounties on their heads when the shooting occurred. Mr. Brisco stated that he reacted when he saw an "older guy," who had previously threatened Mr. Brisco and Mr. Cocroft, make hand gestures and display a firearm. Mr. Brisco denied that drugs or alcohol were involved, "said he empathize[d] with the victim and their family," and related that he did not intend to hurt anyone and was only trying to protect his family.

¶ 12    On May 11, 2023, the trial court held a joint resentencing hearing for Mr. Brisco and Mr. Cocroft.

¶ 13    The State presented victim impact statements from the victims' mothers. The State argued that *Miller* was inapplicable because Mr. Brisco would be eligible for parole after 20 years. The State also said that, if *Buffer* applied, Mr. Brisco could not be sentenced to more than 40 years in prison. The State further argued that Illinois Department of Corrections (IDOC) documents indicated that Mr. Brisco was disciplined for attempting to introduce synthetic cannabinoids into the facility and was an active leader of the Black Disciples prison gang. The State urged the court to impose the same sentences as it had before.

¶ 14    In mitigation, the defense presented certificates Mr. Brisco earned while in custody, a sentencing memorandum, and a forensic psychological evaluation.

¶ 15    In the sentencing memorandum, Mr. Brisco said that he accepted responsibility and had "deep remorse and regret" for his actions. Mr. Brisco asked the court to show mercy, consider the person he was at the time of the offenses, the person he was currently, and the person he hoped to become, and to "impose a non-life sentence" that took into consideration the characteristics of youth and provided a meaningful opportunity for release.

¶ 16    Dr. Brooke Kraushaar performed the forensic psychological evaluation. In her report, Dr. Kraushaar stated that she conducted a clinical interview, a mental status examination, and a psychological assessment inventory. Dr. Kraushaar also considered Mr. Brisco's health, academic, and prison disciplinary records, and interviewed Mr. Brisco's mother. Dr. Kraushaar detailed Mr. Brisco's background in her report, including that his parents were unmarried and addicted to drugs, he was placed in the custody of the Department of Children and Family Services, and he was physically and verbally abused by his great-grandmother. Mr. Brisco had told Dr. Kraushaar that his mother experienced domestic violence and that his parents did not work. Members of Mr. Brisco's family used and sold drugs and were incarcerated. The family moved often because Mr. Brisco's mother had trouble with bills. Mr. Brisco attended seven elementary schools and several high schools.

¶ 17    Dr. Kraushaar stated in her report that Mr. Brisco liked school but was unmotivated and did not feel safe because students brought weapons to school and fought, and he witnessed a peer beaten to death after school. Mr. Brisco was placed in special education classes and had trouble focusing at school, and it appeared that he had repeated the fifth grade. Mr. Brisco related that he was suspended " 'like 30 times.' " He could not take GED classes in prison due to the length of

his sentence.

¶ 18    Mr. Brisco told Dr. Kraushaar that he was bullied because he was small, so he studied fighting and was no longer targeted by age 12. Mr. Brisco fought regularly, "admitted that he lied 'a lot,' " and had stolen from his grandmother and stores. When he was seven or eight, he set fire to a closet while playing with matches. Mr. Brisco began running away from home at age nine and stayed away for up to two weeks. He began staying out all night at age 10. Mr. Brisco "reported that his uncle 'slapped [him] to sleep' when he was nine or 10 years old," and that at age 10 he was knocked unconscious while playing basketball. Mr. Brisco began using marijuana daily at the age of 10, and by age 17 used ecstasy daily. At one point, he spent four months at an inpatient substance abuse treatment program. He said he had "been clean for the past 10 years." Mr. Brisco related that he was sexually abused, and that, starting at age 14, he lived in group homes and youth shelters.

¶ 19    Mr. Brisco told Dr. Kraushaar that, during his childhood, he heard gunshots daily, and he had "personally witnessed 'five or six' shootings" since age nine. Mr. Brisco began selling drugs and carrying a firearm at age 11, when he joined the Black Disciples Nation gang. "He said he felt 'cared for' by the gang" because members bought him clothing and food. Mr. Brisco was respected by the gang and "he was given 'more advanced tasks' " than his peers. When he was 12 years old, he swallowed 18 bags of cocaine to hide the narcotics from police and was hospitalized until he passed the bags. Mr. Brisco "believed he was arrested 'almost 20 times' as a juvenile." At the time of his arrest, Mr. Brisco was employed through a youth advocacy program.

¶ 20    Mr. Brisco related to Dr. Kraushaar that he was treated for depression and PTSD as a child and was diagnosed with bipolar disorder. He was previously prescribed antipsychotics and antidepressants. At the time of the evaluation, Mr. Brisco was not taking medication because "he

wanted to see if he could get by without [it]." Medical and prison records reflected that Mr. Brisco was diagnosed with unspecified depressive disorder and "Mood Disorder NOS," and had several episodes of suicidal ideation. Mr. Brisco had eight disciplinary tickets between 2013 and 2020.

¶ 21 Mr. Brisco's mother told Dr. Kraushaar that Mr. Brisco's father was a good provider despite his heroin addiction and having little contact with his son. She stated that her son was born with heroin in his system and "described him as 'typical but strange,' " explaining that "he often isolated himself and would not speak," and until he was 10 or 11 years old, he would rock himself to sleep after eating. She acknowledged having a drug addiction, that the family "moved around quite a bit," and that Mr. Brisco's great-grandmother was abusive. She also admitted to spending " 'a lot' of time in jail during [Mr. Brisco]'s childhood" but added that she took "good care of her kids, even while she was using drugs." She denied that her children witnessed domestic violence, did not know that Mr. Brisco was in a gang or carried a firearm, and stated that Mr. Brisco did not have behavior problems until his teen years. Mr. Brisco was psychiatrically hospitalized twice when he was 12 or 13 years old. He also went to rehab, and took medication for ADHD, stress, and anxiety.

¶ 22 Dr. Kraushaar diagnosed Mr. Brisco with PTSD, severe cannabis use disorder, and severe "Hallucinogen Disuse Disorder (MDMA)." She noted that, during childhood, Mr. Brisco experienced mental and physical abuse, witnessed domestic violence, and was present at several shooting and murders. She opined that, in addition to Mr. Brisco's "chronological age and its "hallmark features," Mr. Brisco's history of abuse and trauma, PTSD diagnosis, and substance abuse further "limited" his functional maturity and decision-making capacities at the time of the offenses. "Specifically, the intense negative emotion of childhood traumatic experience disrupts maturing mechanisms of emotional regulation." Dr. Kraushaar further stated that traumatized

children can have problems with aggression, delinquency, agitation, and running way, which can represent "an overload of the brain's normal mechanism for handling stress." Moreover, substance abuse during adolescence and early adulthood significantly disrupts and blocks growth and maturity, impedes the development of coping mechanisms, and compromises an adolescent's "already limited judgment." Mr. Brisco was also surrounded by "corruptive modeling" and lacked a well-bonded relationship to a father figure and community network.

¶ 23    Dr. Kraushaar noted that Mr. Brisco reported that on the day of the shooting, he had been shot at by assailants whom, he was later told, were going to beat his sister. She opined that, examining the offense through the "functional immaturity of a 17-year old, whose reasoning capacities were further impacted by his severe trauma history," Mr. Brisco's "emotional arousal and subsequent impulsive response becomes more fathomable." That is, Mr. Brisco was vulnerable to misappraising threats and, without the prefrontal cortex's maturity to regulate his actions, preemptively fired his weapon. She further noted that Mr. Brisco's PTSD symptoms were now managed without medication, and that Mr. Brisco was receptive to change, exhibited improved functional maturity, demonstrated "good institutional adjustment," and accepted responsibility for the offenses. She concluded that Mr. Brisco was maturing and moving toward rehabilitation

¶ 24    In allocution, Mr. Brisco stated that at sentencing 12 years earlier, he was a lost kid facing a long-term prison sentence with no chance to show rehabilitation and restoration to useful citizenship. Mr. Brisco explained that at his prior sentencing, his attorney presented a "totally different defense" than the "facts and the high volume of aggravating and mitigating factors [he] told her about that surrounded the case in its entirety."

¶ 25    Mr. Brisco stated that between second grade and high school, he was bullied and "jumped on by multiple other boys, grown men," but was suspended when he defended himself. At home,

Mr. Brisco endured verbal and physical abuse. In 2009, Mr. Brisco saw "Wild Bill," a high-ranking gang member, use a firearm to beat a kid. Wild Bill then stated that he liked how Mr. Brisco carried himself. In August 2009, Wild Bill told Mr. Brisco and Mr. Cocroft that he was recruiting for the Wild 100s, "his criminal enterprise." Wild Bill wanted them to recruit more "solid young teens and youth like [them]," gave each boy $500, and said to come to his block after school. When they declined and tried to return the money, Wild Bill told them to keep it and that they owed him. One day at school, Mr. Brisco was approached by two boys who stated he was a dead man on borrowed time. Mr. Brisco called his mother, and he transferred to another school. However, he later learned that Wild Bill paid some girls to beat his little sister, who did not transfer schools.

¶ 26    In the beginning of 2010, Mr. Brisco was warned by friends that a group from "down the hill w[ere] trying to jump on [his] little sister." A week later, some of Mr. Brisco's friends were victims of firearm violence perpetrated by the boys recruited by Wild Bill. Several days after that, individuals from "down the hill" shot at Mr. Brisco. This led Mr. Brisco to carry a firearm for protection, receive a firearm charge, and be sentenced to 24 months of probation. While on probation, Mr. Brisco enrolled in a youth advocate program and obtained a summer job.

¶ 27    On the day of the shooting, Mr. Cocroft told Mr. Brisco that kids from "down the hill" pointed a firearm at Mr. Cocroft and threatened to kill him. Then, when Mr. Brisco walked to a nearby gas station, a vehicle approached containing three masked individuals who yelled "D block, b***," and shot at him. Mr. Brisco was not injured. Several hours later, neighborhood children told Mr. Brisco that girls from "down the hill" were trying to jump Mr. Brisco's sister. Mr. Brisco then took a firearm from the room of a friend's family member. He never intended to shoot anyone but wanted to bring his sister home safely.

¶ 28    When Mr. Brisco and Mr. Cocroft arrived at the corner, Mr. Brisco did not see his sister,

but he did see Wild Bill in a van and a group of teenagers. Two boys pointed at Mr. Brisco and, after Wild Bill made "hand movements," a boy went behind a tree and emerged with a chrome firearm. Mr. Brisco fired "out of fear." He asserted that Mr. Cocroft did not know about the firearm and was gone before he fired. Had Mr. Brisco seen children before shooting, he would have left rather than fire his weapon.

¶ 29    Later, Wild Bill arrived, stated that someone shot his daughter, and took one of Mr. Brisco's friends away at gunpoint. When Mr. Brisco learned that girls were shot, he "felt bad." He told his mother that someone tried to kill him twice and asked her to take him a police station. Although he turned himself in, he never had the opportunity to explain what led to the shooting.

¶ 30    Mr. Brisco apologized to the victims' families, stated that he took full responsibility, and asserted that Mr. Cocroft was unarmed. He said, "If you don't come from where we come from or live the life we live, no one can understand the constant fear we live through when we step outside on the streets in the ghetto." He further explained that his parents were drug addicts, that he lived on the street starting at age 13, and that he made a bad choice due to fear. Mr. Brisco asserted that he had grown up and could show rehabilitation given the chance. He related how he spoke to his 13-year-old son "all the time" and tried to encourage his teen nephew not to use a firearm to solve a problem. He told the court that he had read and taken courses for self-rehabilitation and that it was not too late to "recalibrate" himself into society.

¶ 31    Defense counsel argued that no evidence showed that Mr. Brisco was permanently incorrigible; rather, he had a chaotic childhood with drug-addicted parents. Counsel argued that Mr. Brisco, who did not have a fully developed frontal lobe and had a stressful childhood, made "even more poor choices than 17-year old boys normally make." Counsel asked for the statutory minimum prison sentence of 26 years, which would allow Mr. Brisco the opportunity to change

his life.

¶ 32    The court questioned Ariana Jones's mother, who stated that Ms. Jones was then 20 years old and suffered from anxiety and panic attacks.

¶ 33    The trial court stated that no person should have to bury a child but that, "[u]nfortunately, reality is that children die all the time" for many reasons. The court continued, "Other times it's certainly for no reason at all. In this case there is a reason why Tanaja Stokes died. The reason is that Steshawn Brisco and Marcus Cocroft chose to shoot up the block." While Mr. Brisco got older, Tanaja Stokes never did. The court stated that it heard the trial testimony, and that Mr. Brisco's "so-called comment" as to the reason for the shooting was "[a]bsolutely ridiculous." The court did not believe Mr. Brisco's assertion that Mr. Cocroft did not shoot anyone and did not know that Mr. Brisco had a firearm, characterizing it as "[a]bsolute BS." The court noted that the evidence at trial showed that both Mr. Brisco and Mr. Cocroft both fired a weapon and gloated about it afterward. While the court did not think that they meant to shoot the girls, the court did not care about Mr. Brisco's reasons for the shooting, as Mr. Brisco and Mr. Cocroft "couldn't care less who they shot." The court characterized Mr. Brisco and Mr. Cocroft as cold, comparing them to a "murder in the '60's" where "a man murdered eight nurses, one after the other," an apparent reference to the notorious Richard Speck.

¶ 34    The court stated that, at the time of the offense, Mr. Brisco was "a few days away from being 18." The court discounted impetuosity, as this was not a situation where someone on the street saw an opposing gang member. Rather, Mr. Brisco and Mr. Cocroft "roll[ed] down to [*sic*] down the street with guns, more than ready to use them. That's nothing impetuous. That's like planning." While Mr. Brisco and Mr. Cocroft may have been young, they were "mature as far as their thoughts." Additionally, Mr. Brisco and Mr. Cocroft knew the risks, which explained why

they were dressed "so you couldn't see who they were unless you were right on top of them."

¶ 35    The court found no evidence of cognitive or developmental disabilities but acknowledged that Mr. Brisco lived in a tough neighborhood, saw a lot of things someone his age "should probably not have seen," and came from a home that no one would describe as "a great place to live." But the court did not believe this justified killing someone. The court did not find that Mr. Brisco was subject to outside pressure, noting that Mr. Brisco stated he was there to retrieve his sister and mentioned nothing about the gang. As for rehabilitation, the court stated that might occur "after they serve the sentences the law entitled them to get." The court further stated that Mr. Brisco might be rehabilitated inside and serve as a "role model for guys in the penitentiary."

¶ 36    The court noted that the circumstances of the offense included "roll[ing] down from one block to another with guns," and that Mr. Brisco meaningfully participated by shooting.

¶ 37    The court then stated that at the time of the offense, Mr. Brisco was on probation for a firearm charge and had a juvenile adjudication for burglary. The court found that Mr. Brisco "does feel badly to some extent, not about the fact that he killed that girl, none at all, [but] about being in prison now." Referring to the sentencing memorandum, the judge said, "On page 1 [Mr. Brisco's counsel] writes, Steshawn Brisco lives every day with deep remorse. Are you kidding me? There is no remorse for Mr. Steshawn Brisco."

¶ 38    Regarding the forensic psychological evaluation, the court found it "somewhat insulting" that Dr. Kraushaar referred to Mr. Brisco, "a cold-hearted murderer," by his first name. The judge said if it had ever referred to either Mr. Brisco or Mr. Cocroft by their first names, it was "a mistake on [his] part" because "[t]hey did not earn that respect to be called by their first names like they're little kids doing nothing." In response to Mr. Brisco's statement at resentencing, the court characterized it as a "ridiculous version of what happened," saying that "[t]he real story came out

at the trial."

¶ 39 The court stated that it considered Mr. Brisco's youthfulness and immaturity and "every single thing in these reports." The judge said that he also considered the *Miller* factors, "even though I don't have to," and stated that the sentence to be imposed would not violate *Buffer*. The court said that the "harm suffered by the victim is not dependent upon the age of the perpetrator" and noted that Mr. Brisco was "two days short of 18" years old. The court also considered the PSI report, the professional reports, and the parties' arguments. The court questioned, however, how Mr. Brisco could "be serious with [his] nonsensical, ridiculous mitigation statements," said that it had no sympathy for Mr. Brisco at all, and characterized him as a "lost cause." The court disagreed with Mr. Brisco's assertion that the shooting was an accident: "This [wa]s a straight up murder." The court did not believe Mr. Brisco's "nonsensical story, not one single word of it."

¶ 40 At one point, the judge stated, "When I first got this case, I said is the Appellate Court kidding me, but the dissent said it aptly, the majority coldly characterized this murder as being committed by two kids. Wow. Chronologically, maybe you could say that based on age."

¶ 41 The trial court imposed a 33-year prison term for first degree murder and a consecutive 6-year term for aggravated battery with a firearm.

¶ 42 Mr. Brisco filed a motion to reconsider the sentence. The court denied the motion and this appeal followed.

¶ 43                                    II. JURISDICTION

¶ 44 The court denied Mr. Brisco's motion to reconsider on June 16, 2023. Mr. Brisco timely filed his notice of appeal on July 3, 2023. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. March 12, 2021), governing appeals from final judgments in criminal

cases.

¶ 45                                III. ANALYSIS

¶ 46    On appeal, Mr. Brisco contends that the trial court (1) violated section 5-4.5-105(a) of the

Code and abused its discretion by "failing to accurately consider" the *Miller* factors, and (2) was

"improperly predisposed to impose the harshest penalty it could without possibly violating

[*Buffer*], based in large part upon resentment toward this [c]ourt for reversing its prior decision."

We consider each issue in turn.

¶ 47              A. The Trial Court Did Not Fail to Apply the Section 5-4.5-105(a)

                    Sentencing Factors or Abuse its Discretion

¶ 48    The Illinois Constitution requires that all sentences "be determined both according to the

seriousness of the offense and with the objective of restoring the offender to useful citizenship."

Ill. Const. 1970, art. I, § 11. To achieve this objective:

> "the trial court must consider a number of aggravating and mitigating factors including: the
>
> nature and circumstances of the crime, the defendant's conduct in the commission of the
>
> crime, and the defendant's personal history, including his age, demeanor, habits, mentality,
>
> credibility, criminal history, general moral character, social environment, and education."
>
> (Internal quotation marks omitted.) *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 49    A trial court is entitled to great discretion in sentencing. *People v. Stacey*, 193 Ill. 2d 203,

209 (2000). This is because the trial court has the chance to consider all of these factors "which is

superior to that afforded by the cold record in [the reviewing] court." (Internal quotation marks

omitted.) *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Accordingly, where a sentence falls within

the statutorily mandated guidelines, it is presumed to be proper. *Knox*, 2014 IL App (1st)

120349, ¶ 46. A reviewing court will not reweigh the aggravating and mitigating factors or

substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50.

¶ 50    In *Miller*, the United States Supreme Court held that the eighth amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders. *Miller*, 567 U.S. at 479. The Supreme Court therefore instructed sentencing courts to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at 480. Section 5-4.5-105 of the Code adopts the factors discussed in *Miller* and applies them to sentences for offenses committed when a defendant is under 18 years of age. *People v. Woodson*, 2024 IL App (1st) 221172, ¶ 89. This court has noted that "[t]he purpose and spirit of section 5-4.5-105 of the Code is to rectify[ ] the core concerns implicated when sentencing juvenile offenders as addressed by *Miller* and its progeny." (Internal quotation marks omitted.) *Id.*

¶ 51    Pursuant to section 5-4.5-105, when sentencing a person who was less than 18 years old at the time of an offense, the trial court

>  "shall consider the following additional factors in mitigation in determining the appropriate sentence:

>  (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

>  (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

>  (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate." 730 ILCS 5/5-4.5-105(a) (West 2018). This section also gives the trial court discretion to "decline to impose any otherwise applicable sentencing enhancement based upon firearm possession *** with personal discharge that proximately causes *** death to another person." 730 ILCS 5/5-4.5-105(b) (West 2018).

¶ 52    Here, Mr. Brisco's conviction for first degree murder was subject to a sentence of 20 to 60 years in prison (see 720 ILCS 5/9-1(a)(1) (West 2010); 73- ILCS 5/5-4.5-20(a) (West 2010)) and his conviction for aggravated battery with a firearm was subject to a sentence of 6 to 30 years (see 720 ILCS 5/12-4.2(a)(1), (b) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010)). Because Mr. Brisco was found guilty of first degree murder and aggravated battery with a firearm where the victim suffered severe bodily injury, he was subject to consecutive sentences. See 730 ILCS 5/5-8-4(d)(1) (West 2010). Mr. Brisco was therefore facing a sentence from 26 to 90 years.

¶ 53    Initially, the trial court imposed on Mr. Brisco a 75-year sentence. We affirmed on direct appeal (Brisco, 2015 IL App (1st) 130545-U), but then were instructed by our supreme court to vacate that order and consider whether, under *Buffer*, 2019 IL 122327, Mr. Brisco received a *de facto* life sentence in violation of the eighth amendment and *Miller*. *Brisco*, No. 119159.

¶ 54    In *Buffer*, our supreme court defined a *de facto* life sentence as anything over 40 years and

explained:

> "[T]o prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing sentence." *Buffer*, 2019 IL 122327, ¶¶ 27, 40.

After considering Mr. Brisco's initial sentence in light of *Buffer*, we remanded for resentencing because we found the trial court had imposed a sentence in excess of 40 years without considering the *Miller* factors. *Brisco*, 2020 IL App (1st) 130545-UB, ¶¶ 106, 119. We also noted that, at the time of the initial sentencing hearing, the trial court "had no reason to view [the 75-year sentence]—which was far less than the maximum possible—as a life sentence that could only be imposed after consideration of specific youth-related factors and in rare circumstances." *Id.* ¶ 106.

¶ 55 Now, after his new sentencing hearing, Mr. Brisco has received a sentence totaling 39 years. Not only is this a significant reduction from his 75-year sentence, but it is less than the 40 years that *Buffer* defined as a life sentence and well within the statutory range and thus presumed proper. That presumption may only be overcome if we find the trial court abused its discretion by imposing a sentence that is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 56 Because Mr. Brisco had the benefit of resentencing, he will now also be eligible for parole after he has served 20 years of his sentence. See 730 ILCS 5/5-4.5-115 (West 2022) (an individual who committed the offense of first degree murder when they were under 21 years old who is sentenced on or after January 1, 2019, "shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence"). In *People v. Spencer*, 2025 IL

130015, ¶ 40, our supreme court held that even a sentence that is longer than 40 years is not considered a *de facto* life sentence if the defendant is eligible for parole review after serving 20 years of his sentence because that eligibility is "a meaningful opportunity to obtain release before he spends 40 years in prison." So not only was Mr. Brisco not resentenced to what *Buffer* defined as a *de facto* life sentence, but he is eligible for a meaningful opportunity to obtain release after serving 20 years.

¶ 57    Mr. Brisco acknowledges these facts but cites comments that the court made in imposing his new sentence and evidence that was presented that the court either disparaged or failed to acknowledge in imposing sentence. But we cannot determine whether a sentence was improper based on isolated words or statements of the trial court but must instead consider "the entire record as a whole." *Ward*, 113 Ill. 2d at 526-27. Looking at the entire record, we cannot find that the trial court's imposed sentence of 39 years was "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 58    A "trial court need not articulate each factor it considers in rendering the sentence for a juvenile offender, and that omission does not mean the trial court did not consider all relevant factors." *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 31. Moreover, "[w]here relevant mitigating evidence is before the court, it is presumed that the court considered it absent some indication in the record to the contrary other than the sentence itself." (Internal quotation marks omitted.) *People v. Lopez*, 2019 IL App (3d) 170798, ¶ 23).

¶ 59    Mr. Brisco has not identified evidence to overcome that presumption. The trial court explicitly stated that it considered Mr. Brisco's youth along with the other *Miller* factors, and it also considered the PSI report, the parties' arguments, and "every single thing in those reports." And despite the court stating that it did not believe the *Miller* factors applied, the record reflects

its consideration of those factors. While the trial court may not have found this evidence persuasive, it is clear from the record that the court considered it.

¶ 60     Mr. Brisco challenges the way the court weighed the evidence and applied the factors. He correctly notes that the trial court was dismissive and derisive of his explanation and apology at the resentencing hearing, of Dr. Kraushaar's thorough psychological evaluation of him and her conclusions, and of the potential effect his childhood and upbringing may have had on him. However, a trial court is entitled to judge "the credibility, demeanor, general moral character, mentality, social environment, habits, and age" of the defendant. *Knox*, 2014 IL App (1st) 120349, ¶ 46. And while the trial court was required to consider Mr. Brisco's rehabilitative potential, it was also required to balance that with the seriousness of the offense. See *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 99 (rejecting the argument that "the seriousness of the criminal offense had taken a back seat to rehabilitative potential for the purposes of juvenile sentencing" and noting that the seriousness of the offense "remains the most important factor when a trial court undertakes to balance the retributive and rehabilitative purposes of punishment"). In our prior decision, we found this crime was "horrific." *Brisco*, 2020 IL App (1st) 130545-UB, ¶ 115. The trial court was allowed to focus on that fact.

¶ 61     More specifically, Mr. Brisco argues that the court disregarded his "impetuosity, and level of maturity at the time of the offense." But the court did consider these factors—giving impetuosity less weight because Mr. Brisco was armed and "more than ready to use" his gun when he went to the scene of the shooting and giving level of maturity less weight because Mr. Brisco was close to 18 at the time of the shooting. As Mr. Briscoe notes, the trial court's conclusions were inconsistent with those of Dr. Kraushaar. But the court was entitled to make credibility determinations and reject findings in Dr. Kraushaar's report.

¶ 62    Mr. Brisco also takes issue with what he characterizes as the trial court's improper disregard for his "history of childhood trauma and potential for rehabilitation." But the trial court clearly did consider these factors and found them insufficient to outweigh the seriousness of the crime. Again, we have no authority to reweigh the factors on review.

¶ 63    Based on the record before us, we cannot say the court's imposition of a 39-year sentence was either a violation of the statute or an abuse of discretion.

¶ 64                          B. Mr. Brisco Was Not Denied Due Process

¶ 65    Mr. Brisco further contends that he was denied due process because the trial court failed to provide a fair sentencing hearing. He argues that the court was improperly predisposed to impose the harshest possible penalty largely based on its supposed resentment that its prior sentencing decision was vacated.

¶ 66    ="A sentencing hearing is fundamentally unfair when the proceeding is affected by judicial bias." *People v. Montgomery*, 2023 IL App (3d) 200389, ¶ 28. A defendant alleging bias must overcome the presumption that the judge at issue was impartial. *Id.* We review *de novo* whether a trial court demonstrated bias against a defendant resulting in a fundamentally unfair sentencing hearing. *Id.*

¶ 67    While a trial court's negative comments toward a defendant can demonstrate bias or prejudice, they do not necessarily do so. We have attempted to draw this line in numerous cases. Compare *People v. Jones*, 2016 IL App (1st) 141008, ¶¶ 37-38 (finding the judge's "sarcastic and biased comments reflected neither dignity nor courtesy" and thus found remand to a new judge was necessary) and *People v. Moore*, 2023 IL App (1st) 211421, ¶ 128 ("While the trial court here made remarks that were uncomplimentary to [the] defendant, in the context of the entire proceeding they did not rise to the level of prejudice or bias."). "[T]he mere expression by a judge

of an opinion, or the fact that a judge has strong feelings on an issue, does not amount to bias or prejudice." *People v. Nelson*, 206 Ill. App. 3d 956, 967 (1991); see also *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 48 ("harsh criticism, based on the particular facts of a defendant's case, does not constitute any sort of evidence of prejudice derived from personal bias"). "*Not establishing bias or partiality *** are expressions of impatience, dissatisfaction, annoyance, and even anger, that even *** judges, sometimes display.*" (Emphasis in original.) *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).

¶ 68    In reviewing the record for bias, this court will order a new sentencing hearing when the trial court's comments indicate that the court "has predetermined a defendant's sentence before considering the relevant statutory factors." *People v. Morris*, 2023 IL App (1st) 220035, ¶ 61. We have also found resentencing appropriate when the trial court's comments reveal that the court "refused to consider the whole range of statutorily permissible sentences." *Id.* ¶ 62.

¶ 69    In this case, the trial court expressed its displeasure with this court's remand for a new sentencing hearing. However, the court reduced Mr. Brisco's sentence from a total of 75 years to a total of 39 years. This was a significant reduction—it cut Mr. Brisco's sentence almost in half. The sentence on the murder conviction was 33 years, which was seven years less than the 40 years that the court believed it was entitled to impose under *Buffer.* Thus, the court's expression of displeasure in no sense represented a refusal to follow this court's order on remand or to impose the harshest penalty possible. We cannot say that, on this record, Mr. Brisco has demonstrated that the trial court was improperly predisposed against him or that Mr. Brisco was denied due process.

¶ 70                                    IV. CONCLUSION

¶ 71    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 72    Affirmed.