2025 IL App (1st) 231151-U
No. 1-23-1151

SIXTH DIVISION
October 31, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 10 CR 21078 (02) |
| | ) | |
| MARCUS COCROFT, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice C.A. Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held:* The trial court did not abuse its discretion in resentencing defendant to an aggregate term of 36 years' imprisonment where it considered the juvenile sentencing factors prior to pronouncing sentence. Defendant also did not present adequate evidence that the court was biased against him and denied him due process in resentencing him.

¶ 2    Following a 2012 jury trial, defendant Marcus Cocroft, who was 16 years old at the time of the offenses, was found guilty of first degree murder and aggravated battery with a firearm and sentenced to an aggregate term of 55 years' imprisonment. We affirmed on direct appeal. *People v. Cocroft*, 2014 IL App (1st) 130191-U. During subsequent postconviction proceedings, the State agreed to vacate defendant's sentences and remand the matter for a new sentencing hearing.

¶ 3         On remand, the circuit court imposed a total of 36 years in prison. Defendant appeals from that order, arguing that (1) his sentence is excessive because the court did not properly consider the mitigating juvenile sentencing factors, treated him as an adult, and confused defendant with his codefendant; and (2) he was denied due process where the sentencing court was hostile and biased against him. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5         Defendant was charged by indictment with 26 counts of first degree murder (720 ILCS 5/9(a)(1)-(3) (West 2010)) with a firearm, 15 counts of attempted first degree murder (*id*. § 8-4(a), 9-1(a)(1) (West 2010)), 1 count of aggravated battery with a firearm (*id*. § 12-4.2(a)(1) (West 2010)), and 5 counts of aggravated discharge of a firearm (*id*. § 24-1.2(a)(1)-(2) (West 2010)). The charges arose from a shooting on August 10, 2010, which resulted in the death of eight-year-old Tanaja Stokes and a head injury to six-year-old Ariana Jones. The facts of the case have been detailed in this court's order on direct appeal. See *Cocroft*, 2014 IL App (1st) 130191-U. Thus, we only recount the facts necessary to resolve the issues on appeal.

¶ 6                              A. Jury Trial and Sentencing

¶ 7         Defendant was tried as an adult in a joint and severed jury trial with codefendant Steshawn Brisco, who was 17 years old at the time of the offenses. The State presented evidence at trial that, in 2010, defendant and Brisco lived in the Roseland area of Chicago, where defendant was known by the nickname "Little Marcus." Roseland contained two neighborhoods known as "up the hill" and "down the hill." Defendant and Brisco lived "up the hill" and feuded with residents who lived "down the hill," which was also called "D Block." Between 7 and 8 p.m. on August 10, 2010, defendant and Brisco, who both wore red baseball caps and black clothing, rode their bicycles "down the hill" to an intersection near a group of young men who were standing on the sidewalk.

Defendant and Brisco aimed firearms and fired multiple shots at the group but did not hit any of the young men. However, Stokes and Jones were struck by gunfire as they were jumping rope outside their residence. Stokes was shot in the head and killed, and Jones suffered a gunshot wound to the back of her head but survived.

¶ 8    Witnesses later observed Brisco and defendant "gloating" about the incident. Specifically, Brisco stated that they "got down" and "let loose" on "those N*** on 107th," and that they had "aired out D block" and they "killed one of them n***, man." Brisco also stated that they "did a hit," to which defendant smiled and nodded. Defendant also stated that they "did it to them, man. This is what we do. I just did a hit, woo, woo, woo like that." When defendant spoke about it, he was "loud" and "happy." A witness asked Brisco "weren't the girls down there," and Brisco responded that he did not care, and he and defendant "just let the whole 40 clip go."[1] They did not know whom they hit, but knew they killed someone. The juries found both defendants guilty of first degree murder and aggravated battery with a firearm. Defendant was subsequently sentenced to consecutive sentences of 37 ½ and 17 ½ years' imprisonment for the murder and aggravated battery, respectively.

¶ 9    On direct appeal, we affirmed defendant's convictions over his claims that he was denied a fair trial based on the prosecutor's statements during closing argument and that the automatic transfer provision of the Juvenile Court Act was unconstitutional. *Cocroft*, 2014 IL App (1st) 130191-U.

---

[1] The witness clarified that he was talking about two older girls, and the witness did not see Stokes and Jones at the time.

¶ 10                           B. Initial Postconviction Petition

¶ 11            In 2016, defendant filed a *pro se* postconviction petition, alleging that newly discovered evidence established that a witness was coerced by detectives to name defendant as one of the shooters. Further, defendant contended that the trial court abused its discretion by admitting the prior inconsistent statement of a witness as substantive evidence against him. He also argued that his trial counsel was ineffective for failing to object to the prosecutor's description of the victims as "little" in order to arouse the sympathy of the jury, and by failing to investigate forensic evidence. Finally, defendant alleged that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on appeal. The circuit court summarily dismissed the petition as frivolous and patently without merit. We affirmed and granted appellate counsel leave to withdraw as counsel. *People v. Cocroft*, No. 1-16-1542 (2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 12                         C. Successive Postconviction Petition

¶ 13            On June 8, 2021, defendant filed a *pro se* motion seeking leave to file a successive postconviction petition, arguing that his 55-year sentence was a *de facto* life sentence, and therefore unconstitutional as applied to him. Defendant requested that the court grant him a new sentencing hearing to consider the attendant characteristics of youth. Defendant's petition was advanced to the second stage of proceedings and postconviction counsel was appointed. On October 7, 2021, postconviction counsel filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) and asserted the *pro se* petition adequately presented defendant's claims.

¶ 14            Prior to defendant filing his *pro se* petition, we remanded Brisco's appeal challenging his 75-year sentence pursuant to a supervisory order from the supreme court, vacated his sentences, and ordered a new sentencing hearing so that the trial court could consider youth-related sentencing

factors as required by *Miller v. Alabama*, 567 U.S. 460 (2012). See *People v. Brisco*, 2020 IL App (1st) 130545-UB (otherwise affirming his convictions). On February 8, 2022, in light of the *Brisco* appeal, the State agreed to remand defendant's case for a new sentencing hearing.

¶ 15                                    C. Resentencing Hearing

¶ 16        On May 11, 2023, the court held a combined resentencing hearing for both defendant and Brisco.

¶ 17        Defendant's 2023 presentence investigation report (PSI), ordered March 23, 2023, established that he was 16 years old at the time of the offense, and had no other arrests or convictions. According to the PSI, defendant was raised from the ages of 8 to 16 by his great-grandmother due to the involvement of the Department of Children and Family Services (DCFS). Defendant described his childhood as "rough," although his grandmother provided him with a stable home and his basic needs were met. Defendant's father had been incarcerated for 27 years for first degree murder and was paroled in 2021. Defendant described being angry during his childhood because his father was not present in his life. At the time of the PSI, defendant had an "okay" relationship with him and spoke with him once every few weeks.

¶ 18        After defendant's younger brother died during infancy, defendant's mother struggled with alcohol issues. However, at the time of the PSI, defendant was "really close" with his mother and spoke with her every other day. He also told the investigator that he was "very close" with his younger half-siblings and maintained regular contact with them. Defendant reported receiving "strong support from all of his family."

¶ 19        Defendant attended school through 10th grade, but he was arrested prior to his junior year of high school. He obtained his high school equivalency diploma in 2019, while in custody. He stated that he wished to continue adult education and was interested in obtaining a degree in a

paralegal program. He was also employed in the prison's kitchens and "was promoted to the Majors office and janitorial work." Defendant additionally participated in other educational programs while incarcerated.

¶ 20    The PSI reflected that, prior to his incarceration, defendant lived in what he described as a "messed up" area of Chicago, with shootings, high crime, and "easily available" drugs. He also noted that the area was "gang infested." Despite the crime, defendant felt "comfortable" there, and planned to reside there with his aunt after his release. Defendant also reported that he was a member of the Black Disciples street gang from age 12 until his incarceration, although he denied having a particular rank or role in the gang. Defendant stated that he always tried to "fit in and was influenced by the older gang members."

¶ 21    Defendant first used alcohol at the age of eight, when his great uncle introduced it to him in Kool-Aid. He drank alcohol socially, but did not do so otherwise. He used marijuana daily, and had also used ecstasy since age 13, but denied struggling with substance abuse. Defendant "denied taking any pride in any criminal behavior"; he stated that this "experience has woken him up" and he felt grown. He acknowledged that at the time of the offense, he was "immature and impulsive" and "didn't think about" the consequences of his behavior. Defendant also informed the investigator that he was not involved with his defense when he first went to trial, and his mother and his first attorney "fought a lot." Defendant felt as if his first attorney "was not interested"; but, at the time of the PSI, he was "very involved" with his defense and "fully" understood the details of the case and sentencing hearings.

¶ 22     Defendant's March 31, 2023, mitigation report provided additional information regarding defendant's background.[2] According to the report, defendant's mother was 15 years old when she became pregnant with him, and when defendant was 3, his father was sentenced to 55 years' imprisonment. He was reunited with his father 22 years later in the Menard Correctional Center. When defendant was 4 years old, his 11-month-old brother died from shaken baby syndrome, and his mother was arrested and sentenced to 5 years' imprisonment. Defendant's grandparents also reported that his mother abused defendant and his siblings. DCFS subsequently placed defendant with his grandmother who used drugs and drank alcohol, and whose paramour was violent with her and the children. Defendant's great-grandparents removed defendant and his siblings and they moved to Roseland. In Roseland, defendant was exposed to persistent gun violence and other crime, and many of defendant's role models and friends were killed. Defendant was influenced by negative peer pressure and began using and selling drugs. He also ran away from home multiple times, staying with friends or squatting in abandoned buildings.

¶ 23     During defendant's incarceration, he reflected on the consequences of his actions and was "deeply sorry for his actions." He acknowledged his poor decision-making and was attempting to better himself so that he could "continue to make a positive impact in the world upon his release." During his incarceration, he completed programs, including receiving his high school equivalency diploma, and enrolled in a legal assistant and paralegal program, which he completed with a 96% average. Defendant also taught other prisoners how to use poetry as a coping strategy and planned to develop his skills as a writer.

_____

[2] The title page of the report included a photograph of defendant at age four. The report also contained a photograph of him as a young child wearing a baseball uniform.

¶ 24     Multiple letters of support from family and friends were attached to the report, including those written by his mother, father, grandmother, and sister. In particular, defendant's sister commented that he planned on writing a book about his life. Certificates and awards that defendant earned during his incarceration were also attached to the report.

¶ 25     Defendant's sentencing memorandum argued, in relevant part, that defendant met many of the mitigating factors for juvenile offenders, including "his history of parental neglect, physical abuse, and multiple and profound childhood traumas, his young age at the time of the offense, and his potential for rehabilitation." The memorandum concluded that the record did not establish that defendant was "permanently incorrigible."

¶ 26     In aggravation, the State proffered victim impact statements from Alice Thomas, the mother of Jones, and Debra Thomas, the mother of Stokes. The mothers requested that the State not publish the letters, so the court read them off the record. The letters are in the record on appeal and have been reviewed by this court.[3]

¶ 27     In aggravation, the State recited the *Miller* factors and commented that Brisco was believed to be "actively attempting to introduce synthetic cannabinoids into" the Illinois Department of Corrections, for which he was disciplined. Further, Brisco was an "active leader of a gang in the prison called the Black Disciples," and it did not appear as if "anything" had "changed" with regard to him. The State contended that given the facts of the case, Brisco and defendant should be resentenced in such a way that did not "deprecate the seriousness of these offenses." It argued that the court's original sentences could be reimposed.

---

[3] The victim impact statements were also presented to the court during the original 2012 sentencing hearing.

¶ 28        In mitigation, defendant's counsel presented a video from defendant's mother, which was published.[4] Defendant then spoke in allocution, and apologized to Stokes' family and to Jones. He also apologized for not expressing remorse sooner, because his attorney at trial "said [he] should not say anything at the time." Defendant stated that it "was never the case" that he did not "care."

¶ 29        Brisco also spoke at length in allocution, noting the many challenges in his life, including being bullied and threatened at his high school. Brisco stated that a high-ranking member of the Gangster Disciples street gang named Wild Bill approached him and defendant and attempted to recruit them. Brisco stated that they refused his proposal and, later, discovered that Wild Bill paid girls to hurt his younger sister. Brisco also endured attempts on his life and began carrying a firearm for protection. On the day of the shooting, Brisco was told that "some girls" were going to attack his sister again, so he armed himself without telling defendant that he had done so. They rode their bicycles to the corner, where Brisco saw Wild Bill with teenagers, one of whom pointed a firearm at him. Brisco stated that he shot in self-defense. Brisco did not see children at the residence, and if he had he never would have discharged the firearm. Brisco stated that defendant never discharged a firearm. He informed the court that he wanted to tell the true story of what happened that day, and to apologize to the victims' families. He stated that he never meant to harm the girls, and that he would "swap places" with them "in a heartbeat" if he could. He stated that he wished he died rather than Stokes, and that it was "an accident" because he was afraid. Brisco also apologized to defendant for not telling the truth earlier. He also informed the court how he had matured and sought to be a role model for misguided youths.

¶ 30        Defense counsel argued that the facts about defendant's background in the mitigation report led to the poor decision making and lack of self-control at the time of the shooting. Counsel

---

[4] This video is not in the record on appeal.

acknowledged that the facts of the case were "horrifying," but argued that defendant had grown during custody, had "an excellent disciplinary record," and pursued further education and employment. Defendant also expressed genuine remorse for his involvement in the incident.

¶ 31    Jones' mother, who was present in court, informed the court that Jones was doing well at the time of resentencing other than anxiety and panic attacks. Jones lived with her mother and was working as a beautician.

¶ 32    At the end of the hearing, before the court scheduled another date for its ruling, the court commented about a picture in the mitigation report that showed defendant as a two-year-old child, stating: "Cute kid. You might argue from the other side of the coin on August 10, 2010, he looked a bit different with a gun in his hand."

¶ 33    On the next court date, the court resentenced defendant to consecutive terms of 30 and 6 years' imprisonment for murder and aggravated battery with a firearm, respectively. It also sentenced Brisco to an aggregate term of 39 years' imprisonment. In pronouncing sentence, the court expounded its ruling at length. First, the court quoted a former chief justice of the supreme court who said that "the harm suffered by the victim of a crime does not depend on the age of the perpetrators." The court then commented regarding the "depressing testimony" at trial and noted that "no person should ever have to bury a child." It questioned what Stokes and Jones did to "warrant getting shot" by defendant and Brisco, except being in the wrong place at the wrong time. The court noted that defendant and Brisco acted like "conjoined twins" because they wore the same outfit as they rode their bicycles to the scene. The court commented that the evidence established that they "went there with a reason" and "did not care who they hit."

¶ 34    The court found Brisco's explanation for the shooting to be "ridiculous" and "nonsensical"; nor did the court believe Brisco's statement that defendant did not participate, as the evidence

showed otherwise. The court noted witness testimony that Brisco and defendant were "gloating" about the incident, with Brisco as the "main speaker" while defendant nodded and smiled as Brisco related killing an 8-year-old girl. The court stated "[t]hat shows you what kind of men these are, young men sure, but men nonetheless." The court did not believe that they intended to shoot the two children, but that "they couldn't care less who they shot, that makes it even worse."

¶ 35   It again referred to defendant and Brisco as "conjoined twins" because "[w]hatever one did, the other did, like, randomly shooting down D Block." The court then stated "What does [defendant] say – I'm sorry – Brisco say? Me and Little Marcus just went down and aired 'em out." The court noted that one of the victims' mothers stated that defendant and Brisco were "cold" about the incident, and the court stated that "[c]oldhearted" was a better term. The court then commented that in the 1960s, "a man murdered eight nurses" and that when he was asked why he did so years later, he stated as "[c]old as ice" that it "just wasn't their night." [5] The court also stated that he was "not equating these two gentlemen with the person who made these comments" but rather to illustrate their "coldheartedness." In particular, when Brisco was asked about girls on "D Block" during the shooting, Brisco stated that he did not care, and they "just let the whole 40 clip go."

¶ 36   The court commented that Brisco was being a "loyal accomplice" in claiming that defendant did not know Brisco was going to shoot anyone. As a side note, with regard to defendant's street name "Little Marcus," the court stated that "[defendant] may have been small in size, may have been young, you look a lot different with a gun in your hand, however. You'd look a lot bigger with a gun in your hand." He also commented in a sarcastic manner that the photo

---

[5] The trial court was apparently referring to Chicago serial killer Richard Speck, who was convicted in 1967.

of defendant from the mitigation report of "a cute little kid wearing his little uniform" was "touching."

¶ 37    The court also regarded this court's order 2020 remanding Brisco's case to be "chilling." The trial court quoted from the following portion of the partial dissent in that order criticizing the decision to grant Brisco resentencing:

> "The majority coldly categorizes this murder as being committed by two 'kids' on bicycles who 'bragged, like kids, about it afterwards,' and that 'nothing suggests that they considered in any kind of adult way what the consequences might be for themselves or for others.' *** This minimization of both the defendant and his 'horrific' crime is simply not an acceptable basis to find that defendant is entitled to a resentencing ***." *Brisco*, 2020 IL App (1st) 130545-UB, ¶ 128 (Pierce, J., dissenting in part).

¶ 38    In discussing Brisco's and defendant's ages, the court commented that "[defendant] was only a few days away from being 18 *** [and] his accomplice [defendant] was 16 and a half approximately." The court later acknowledged that it confused defendant and Brisco, because they were "like conjoined twins."

¶ 39    The court continued to address the sentencing factors. Referencing the factor of impetuosity, it concluded that "nothing" about the situation was impetuous as they had planned the shooting. The court then considered the codefendants' level of maturity and stated that "[t]hey may have been young chronologically, but they were mature as far as their thoughts" where they decided "to shoot up D Block, empty that 40." The court noted further that the codefendants knew that a risk was implicated because of how they dressed, but "they didn't care about the risk." The

court also acknowledged that it was undisputed that neither defendant "[came] up that well," and they lived in a "tough neighborhood" and saw things that people their age should not have seen, but that did not justify killing someone.

¶ 40　　　With regard to the sentencing factor addressing peer and familial pressure, the court expressed skepticism regarding the events outlined in Brisco's allocution. However, the court noted that defendant had "nice letters" from family and friends "saying he's a wonderful kid, came up fairly well." In considering the potential for rehabilitation, the court noted that defendant wanted to be a role model for people in the penitentiary and planned to write a book. It mused, "[j]ust imagine that title, Up the Hill, Down the Hill, D Block, Murder."

¶ 41　　　The court also emphasized the circumstances of the offense, including that defendant and Brisco approached with firearms and began shooting before anyone had a chance to get away. The court noted that both defendant and Brisco planned and participated in the offense by traveling together to the shooting, and they both discharged firearms. It told the codefendants that they do not "get rewarded for taking a bad shot."

¶ 42　　　With regard to the "meaningful participation" factor, the court noted "no question" as both defendant and Brisco "were shooting" and acted like "conjoined twins" who were "stuck at the hip."[6] The court noted that Brisco was on probation for a gun charge at the time of the incident and had other prior juvenile criminal history. However, the court acknowledged defendant had "nothing" in terms of prior criminal history.

¶ 43　　　The court also did not credit Brisco's expression of remorse, finding that he felt badly "not about the fact that he killed that girl *** [but] about being in prison now." Continuing addressing

---

[6] The court seemed to confuse or conflate the factors regarding defendant's "participation and specific role in the offense" and whether he was able to "meaningfully participate in his *** defense." See 730 ILCS 5/5-4.5-105(a)(6)-(7) (West 2022).

the same person, the court stated: "[t]hat's what [defendant's] mad about, sad about, not that he killed that 8-year-old girl. When am I getting out?" The court then stated that "[a]s far as [defendant], he participated in this murder."

¶ 44　　The court also expressed distaste for using both codefendants' first names rather than their last names to refer to them. The court commented that it would not refer to them by their first names because they were "two cold-hearted murderers" who "acted in concert" to murder an eight-year-old girl. It stated that they "did not earn that respect to be called by their first names like they're little kids doing nothing." Instead, he asserted that they were "two cold-hearted murderers."

¶ 45　　The court then described Brisco's allocution in length. In doing so, the court stated the following:

> "What if the State told the honest truth and real story? Two guys on bicycles, up the hill, down the hill nonsense, nobody gets a chance to move or anything, Steshawn Brisco and [defendant] started shooting. That's the real story, not want [*sic*] [defendant] wanted to tell me nonsense a few weeks ago.
>
> Honest truth and real story. The jurors heard the honest truth and real story that you and your able assistant, [defendant], are simply *** cold-hearted murderers. That's the real story. That's the truth."

The court also commented that the "lies" which were told in court were "fake news" and asserted that "somebody might say that" when "someone does something wrong," which was "neither here nor there."

¶ 46　　The court again commented that he had to consider the defendants' youthfulness and immaturity, and he had done so "over and over and over" regarding both codefendants. It noted

that it considered "every single thing" in the reports and every argument the attorneys had made. It stated that it had "no beef" with the codefendants and did not personally dislike either of them, but it did not like "what they did." Again, the court commented about the events including that Brisco and defendant "gloated" about shooting children. It also repeated that defendant, who was known as "Little Marcus," looked "a lot bigger with that gun in his hand." The court also stated the following regarding defendant:

> "[Defendant] wants to write a book, my god, a book. If he writes a book, I won't be around to read it. I'll probably be gone by then. Depending on what he might write in that book, people on D Block, unfortunately, have to live in that situation. They know what kind of person [defendant] is, what kind of person Brisco is."

However, the court also commented that "[t]here are some things about [defendant] that warrant consideration." It noted that defendant lacked the criminal record that Brisco had, grew up with a family that was not "the greatest," and that he met his father in prison.

¶ 47     The court further stated that "[t]here has to be some deterrent to murder also *** some element of punishment." The court again referred to defendant's desire to write a book, commenting that "[u]p the block, down the block, absolute ridiculous nonsense to kill someone over," and stated that defendant would have "plenty of time to write it." The court again listed the evidence presented for the sentencing hearing and noted defendant's "very short and to the point" allocution, where he apologized. The court addressed defendant and stated that sometimes "sorry doesn't cut it." The court then contrasted defendant with Brisco who "shows not one iota, not one, of remorse."

¶ 48    Right before sentencing, the court noted that the codefendants would spend "a lot of calendars inside." It specifically noted that "[defendant] will get back to his gang guys in the penitentiary. I'm not confident about what [defendant] will do. No evidence about that regarding him with gang stuff." It again noted that "[defendant]" was "still" a member of the Black Disciples, according to a prison report. It also stated that it read letters from defendant's friends and family members, and noted "a little twinge of hope" existed for defendant. It again stated that it considered the relevant reports and evidence, including defendant's PSI, sentencing memorandum, activities and education while in prison, letters from friends and family, and allocution. The court again commented that defendant was known as "Little Marcus," who was "a lot bigger with a gun in [his] hand," and it "found a glimmer" regarding him. It sentenced him to an aggregate term of 36 years' imprisonment.

¶ 49                              D. Post-resentencing

¶ 50    On June 16, 2023, defense counsel filed a motion to reconsider defendant's sentence. It argued that defendant's sentence was excessive because (1) defendant had no criminal background when he was arrested, (2) no evidence was presented of bad behavior during incarceration, (3) there was no alleged post-arrest gang activity, and (4) defendant showed genuine remorse at the resentencing hearing. Defense counsel also asserted that his sentence was excessive due to mitigating factors, including his work and educational history during incarceration, as well as his "[r]emarkably challenging upbringing," and that the court failed to consider other factors in mitigation, including his family support. Defense counsel argued that the court additionally erred when it noted that "the harm suffered by the victim of a crime does not depend on the age of the perpetrators," compared the codefendants to "conjoined twins," considered its own "distaste" for the appellate court's ruling, confused the codefendants, and found the codefendants were "mature

as far as their thoughts." Defense counsel also argued that the court erred when it used factors in mitigation as aggravation, particularly regarding their upbringing and poor decision making. As a final matter, defense counsel argued that the court erred when it referred to defendant's father, whom defendant met during his incarceration, in aggravation rather than mitigation.

¶ 51    That same day, the court denied defendant's motion to reconsider, noting that it considered the juvenile sentencing factors, but that "doesn't excuse or *** mitigate the murder of an 8-year-old girl." It repeated that "Little Marcus *** look[ed] a lot bigger with a gun in [his] hand." However, it also commented that it lowered the sentence for defendant and he will be "getting out" still as a young man. It noted the "slim" possibility that defendant had "changed his ways" in prison, stating that defendant had done well with regard to awards and education. However, it could not "avoid" considering the nature of the crime itself and stated that the sentence was "lenient" given the facts of the case. Defendant filed a timely notice of appeal.

¶ 52                                II. ANALYSIS

¶ 53    On appeal, defendant argues that his sentence was excessive where the resentencing court ignored the juvenile sentencing factors or did not consider them mitigating, treated him and Brisco as "men," and repeatedly confused him with Brisco. Defendant further contends that the resentencing court was hostile toward him and Brisco, and that it disregarded the statutory principles of juvenile sentencing. Defendant argues that the court's errors merit a new sentencing hearing before a different court. Alternatively, he requests that we reduce defendant's sentence under Supreme Court Rule 615(b) (eff. Sep. 15, 2025).

¶ 54                            A. Standard of Review

¶ 55    A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I § 11; *People v. Neasom*, 2017 IL App

(1st) 143875, ¶ 48. A sentencing court's decision is reviewed for abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A court abuses its discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id*. (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). The court has broad discretion in imposing a sentence and is afforded great deference because the judge "observed the defendant and the proceedings," and is better positioned to weigh the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. at 212-13. The reviewing court " 'must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Id.* at 213 (quoting *Stacey*, 193 Ill. 2d at 209).

¶ 56    A reviewing court may reduce the sentence imposed on a defendant by the sentencing court under Illinois Supreme Court Rule 615(b)(4) (eff. Sep. 15, 2025). "That power, however, should be exercised 'cautiously and sparingly.' " *Alexander*, 239 Ill. 2d at 212 (quoting *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988)).

¶ 57                                B. Excessive Sentence

¶ 58    A sentence within the statutory range is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Here, defendant was convicted of first degree murder and aggravated battery with a firearm, with sentencing ranges of 20 to 60 years' imprisonment, and 6 to 30 years' imprisonment, respectively. 730 ILCS 5/5-4.5-20(a)(1) (West 2010); 720 ILCS 5/12-4.2(a)(1), (b) (West 2010); 730 ILCS 5/5-4.5-25(a) (West 2010). As defendant was found guilty of first degree murder and aggravated battery with a firearm where the victim suffered severe bodily injury, he was subject to consecutive sentences. See 730 ILCS 5/5-8-4(d)(1) (West 2010). Defendant, therefore, faced a sentence from 26 to 90 years' imprisonment. His aggregate 36-year sentence

falls within these statutory guidelines and is, therefore, presumed to be proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 59      Although defendant's sentence falls within the statutory range, he first argues the sentencing court abused its discretion by not adequately considering the characteristics of his youth, noting that he was young only "chronologically," comparing him with Richard Speck, and in acknowledging his nickname "Little Marcus," noting that he looked "a lot bigger with a gun" in his hand. Defendant also contends that the court seemed dismissive regarding the notion of acknowledging his age, and that although it reviewed the juvenile sentencing factors, it applied no mitigating effect to them. He further argues that the court's consideration of the deterrent effect of a sentence is inapplicable in juvenile sentencing determinations, the court minimized his home life and history of trauma, and that the court ignored evidence of his rehabilitation.

¶ 60      Here, the State agreed to remand defendant's case for resentencing for the court to consider the juvenile youth sentencing factors which were codified under Section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2022)). These factors include, *inter alia*, the offender's age, impetuosity, and level of maturity, including the ability to consider risks and consequences of behavior, his family and home environment, his potential for rehabilitation or evidence of rehabilitation, the circumstances of the offense, and his participation in the offense. 730 ILCS 5/5-4.5-105(a)(1), (3), (4), (5), (6) (West 2022). The court need not articulate each factor it considers in rendering a sentence for a juvenile offender, and that omission does not mean the court did not consider all relevant factors. *People v. Villalobos*, 2020 IL App (1st) 171512, ¶ 74. Absent "affirmative indication to the contrary," we presume that the court considered all mitigating evidence before it. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 61    Additionally, under *People v. Buffer*, 2019 IL 122327, our supreme court defined a *de facto* life sentence as over 40 years' imprisonment. Such a sentence violates the eighth amendment when imposed on a juvenile offender without consideration of the defendant's youth and attendant characteristics in mitigation. *Id.*, ¶¶ 41-42. As held by the supreme court in *People v. Spencer*, 2025 IL 130015, ¶ 40, a sentence longer than 40 years is not considered a *de facto* life sentence where the defendant will be eligible for parole review after serving 20 years of his sentence.

¶ 62    Here, defendant was resentenced to an aggregate term of 36 years' imprisonment, and he is eligible for parole review after serving 20 years of his sentence. See 730 ILCS 5/5-4.5-115(b) (West 2022) ("A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review *** after serving 20 years or more of his or her sentence."). Thus, defendant was not sentenced to a *de facto* life sentence. Defendant nevertheless contends that the court made numerous comments indicating its refusal to consider his status as a juvenile in imposing sentence, as outlined above. However, we must not consider these statements in isolation, but rather must consider the entire record. See *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30. Reviewing the entire record, we do not find defendant's 36-year sentence to be " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Alexander*, 239 Ill. 2d at 212.

¶ 63    Absent affirmative evidence to the contrary, a trial court is presumed to have considered the mitigating evidence before it. *Kindle*, 2021 IL App (1st) 190484, ¶ 67. Here, the trial court explicitly addressed each juvenile statutory factor and all the evidence before it during its lengthy pronouncement. Although the court expressed distaste for considering the juvenile sentencing factors, it did consider them. We acknowledge that the court granted them little weight compared to the facts of the case itself. This was its prerogative, because "[a] defendant's rehabilitative

potential \*\*\* is not entitled to greater weight than the seriousness of the offense." See *Alexander*, 239 Ill. 2d at 214; see *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 99 (noting that the seriousness of the offense "has not been displaced" by rehabilitative potential in juvenile sentencing). As we expressed in Brisco's appeal from the same resentencing hearing, the facts of this case are "horrific." See *People v. Brisco*, 2025 IL App (1st) 231224-U, ¶ 60 (affirming Brisco's 39-year sentence)[7]. The court was well within its discretion to balance that factor more heavily.

¶ 64     As part of this same challenge, defendant further contends that the court confused the codefendants, noting that it called them "conjoined twins" and regularly referred to evidence relating to Brisco in discussing defendant, who displayed more evidence of rehabilitation than Brisco. This argument is not persuasive, however. Reading the court's comments in context, it clearly understood the difference between the rehabilitative potential of defendant and Brisco, noting a "glimmer" of hope for defendant, and commenting that defendant had family support. However, again, the trial evidence established that defendant fully participated in the shooting which resulted in the death of an eight-year-old girl, and a severe head injury to her six-year-old cousin. The trial evidence also showed that defendant gloated with Brisco about the shooting afterward. As noted, the court was not required to consider his rehabilitative potential more seriously than the facts of the offense. See *Alexander*, 239 Ill. 2d at 214.

¶ 65     Given this record, defendant's argument that the court abused its discretion amounts to a request for this court to reweigh the evidence and substitute its judgment for that of the sentencing court. This we will not do. See *id.* at 213. Defendant has failed to meet his burden to affirmatively show that the court did not adequately consider all relevant factors during sentencing. See *Kindle*,

---

[7] Under Illinois Supreme Court Rule 23(e)(1) (eff. June 3, 2025), unpublished orders entered on or after January 1, 2021, may be cited for persuasive purposes.

2021 IL App (1st) 190484, ¶ 67. We thus find that the court did not abuse its discretion in sentencing defendant and affirm his sentence of 36 years' imprisonment.

¶ 66                                    C. Judicial Bias

¶ 67        Defendant further contends that he was denied due process because the resentencing court was biased against him. Defendant argues that the court's sarcastic and hostile comments toward him undermined his right to a fair trial, where it viewed defendant as a "cold-hearted" murderer rather than a juvenile offender, "mocked" the idea that he might write a book, "jeered" and "sneered" at defendant's nickname and childhood photographs, and compared defendant to mass murderer Richard Speck and president Donald Trump. Defendant also argues that the court's comments referring to defendant and Brisco as "conjoined twins" treated them interchangeably.

¶ 68        As an initial matter, defendant acknowledges that he did not raise his due process challenge before the trial court, forfeiting the claim. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 (2010). Defendant contends that this procedural default rule "is not rigidly applied where the basis for the objection is the conduct of the trial judge." See *People v. Sims*, 192 Ill. 2d 592, 636 (2000) (citing *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963)). However, the *Sprinkle* doctrine is only applicable where trial counsel's objection would have "fallen on deaf ears." See *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). Here, defense counsel was present and "had every opportunity to raise an objection before the trial court." See *id*. Thus, we find that defendant has not presented a compelling reason to relax the forfeiture rule.

¶ 69        Alternatively, defendant seeks review under the second prong of the plain error doctrine, which allows a reviewing court to consider an unpreserved claim where a clear and obvious error occurred, and the error is so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. "When a defendant fails

to establish plain error, the result is that the 'procedural default must be honored.' " *People v. Naylor*, 229 Ill. 2d 584, 593 (2008) (quoting *People v. Keene*, 169 Ill. 2d 1, 17 (1995)). The initial consideration is whether a clear and obvious error occurred at all. *Hillier*, 237 Ill. 2d at 545.

¶ 70    Here, we conclude that no clear and obvious error occurred, because the court's comments do not establish that it was biased against defendant or denied him due process.

¶ 71    "A sentencing hearing is fundamentally unfair when the proceeding is affected by judicial bias." *People v. Montgomery*, 2023 IL App (3d) 200389, ¶ 28. Trial judges are presumed to be impartial, and the party challenging the judge's alleged impartiality bears the burden of overcoming this presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. "Something more" than an unfavorable result toward the defendant is required to demonstrate judicial bias, which includes "a showing of animosity, hostility, ill will, or distrust towards [a] defendant." *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 47. Further, "harsh criticism, based on the particular facts of a defendant's case, does not constitute any sort of evidence of prejudice derived from personal bias." *Id*. ¶ 48. Also, this court will order a new sentencing hearing where the court's comments "indicate that he or she has predetermined a defendant's sentence before considering the relevant statutory factors" or where the comments "reveal that he or she refused to consider the whole range of statutorily permissible sentences." *People v. Morris*, 2023 IL App (1st) 220035, ¶¶ 61-62.

¶ 72    Here, the resentencing court expressed anger and disapproval at defendant's role in the shooting, as well as displeasure with this court's remand of the *Brisco* appeal for a new sentencing hearing. The court made multiple negative and harsh criticisms of defendant's actions; however, these criticisms do not rise to the level of bias against him. See *Rademacher*, 2016 IL App (3d) 130881, ¶ 48. This is especially true where there is no support for the notion that the resentencing

court predetermined defendant's sentence or "refused to consider the whole range of statutorily permissible sentences." See *Morris*, 2023 IL App (1st) 220035, ¶¶ 61-62. In fact, here, the court significantly reduced defendant's sentence from an aggregate term of 55 years' imprisonment to an aggregate term of 36 years' imprisonment. Therefore, although the court harshly criticized defendant's actions, it declined to impose the harshest punishment possible. Thus, on this record, defendant has not established that the court was biased against him or that he was denied due process. Where there is no reversible error, the plain error doctrine does not apply. See *Hillier*, 237 Ill. 2d at 545.

¶ 73                                 III. CONCLUSION

¶ 74        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 75        Affirmed.